UNITED STATES of America, Appellee,

v.

**Clarence Robert ROBIE, Defendant–Appellant.**

**Docket No. 97–1672**

United States Court of Appeals, Second Circuit.

Argued Aug. 25, 1998.

Decided Jan. 28, 1999.

Richard C. Daddario, Assistant U.S. Attorney for the Southern District of New York, New York, N.Y. (Mary Jo White, U.S. Atty. for the Southern District of New York, Craig A. Stewart, Dietrich L. Snell, Assistant U.S. Attorneys, on the brief), for Appellee.

Henriette D. Hoffman, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, NY, for Defendant–Appellant.

Before: MESKILL, WALKER, and SACK, Circuit Judges.

SACK, Circuit Judge:

Clarence Robert Robie appeals from a judgment of conviction and sentence entered by the United States District Court for the Southern District of New York (Batts, *J.*) following a jury trial for theft of property made under contract for the United States worth more than $100 in violation of 18 U.S.C. § 641 and for interstate transportation of stolen property worth $5,000 or more in violation of 18 U.S.C. § 2314. He asserts that the evidence was insufficient to sustain his felony conviction under 18 U.S.C. § 641 because it did not establish beyond a reasonable doubt that the stolen property (i) was worth more than $100 and (ii) was "made under contract for the United States."[1] He also contends that his conduct did not violate 18 U.S.C. § 2314 because the government did not prove beyond a reasonable doubt that the property he transported across state lines was worth $5,000 or more.[2] In the alternative, Robie asserts that his conduct fell within the "spurious representation" exception of section 2314. Finally, Robie contends that the district court miscalculated his offense level under section 2B1.1 of the United States Sentencing Guidelines. We disagree with all but the last assertion and therefore affirm except that we remand the case to the district court for resentencing.

1. The version of 18 U.S.C. § 641 under which Robie was prosecuted provided, in pertinent part:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of ... any property made or being made under contract for the United States or any department or agency thereof; ...
> Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined under this title or imprisoned not more than one year, or both.
> The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

2. 18 U.S.C. § 2314 provides, in pertinent part:

> Whoever transports, transmits or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; ...
> Shall be fined under this title or imprisoned not more than ten years, or both.
> This section shall not apply to any falsely made, forged, altered, counterfeited or spurious representation of an obligation or other security of the United States, or of an obligation, bond, certificate, security, treasury note, bill, promise to pay or bank note issued by any foreign government. This section also shall not apply to any falsely made, forged, altered, counterfeited, or spurious representation of any bank note or bill issued by a bank or corporation of any foreign country which is intended by the laws or usage of such country to circulate as money.

## BACKGROUND

Robie was charged under Count One of an indictment filed in February 1997 with "unlawfully, willfully, and knowingly . . . embezzl[ing], steal[ing], purloin[ing] and knowingly convert[ing] to his use and the use of another property made under contract for the United States and a department and agency thereof, to wit, . . . approximately 160 Richard Nixon commemorative 32¢ stamps" from Banknote Corporation of America, Inc. ("Banknote") "which stamps were the property of the United States Postal Service and were misprinted, misaligned and had the words 'Richard Nixon' printed upside down, and which had a market value exceeding $100," in violation of 18 U.S.C. § 641. Count Two of the indictment charged Robie with "unlawfully, willfully and knowingly . . . transport[ing] and transfer[ring] in interstate commerce goods, wares and merchandise of the value of $5,000 and more," specifically the misprinted Richard Nixon stamps referred to in Count One, "knowing the same to have been stolen, converted and taken by fraud," in violation of 18 U.S.C. § 2314.

Banknote specializes in printing government and other official documents including postage stamps, social security cards and government visas. Its production of stamps is heavily regulated; the government imposes detailed security and quality controls. For example, Banknote employees are required to inspect all finished stamps to ensure that they conform to contract specifications and are of a quality that is acceptable to the Postal Service. Stamps that are nonconforming are deemed "press waste" and are segregated from the stamps that pass inspection. Press waste routinely is placed in a high-security vault where it is stored pending destruction upon specific authorization by the Postal Service. The Postal Service requires destruction of press waste because, among other things, the paper has a phosphor coating that would permit the defective stamps to be used as valid postage, and the Postal Service wants to circulate only high-quality, conforming stamps.

A stamp misprinted so that some of it is upside down is known as an "invert." Inverts are of little value except in the highly unusual instance where they are officially and accidentally issued by the Postal Service. Then, their rarity may render them highly valuable among collectors.

On December 5, 1994, the Postal Service gave Banknote a purchase order calling for it to print 80 million commemorative Richard Nixon postage stamps. In the course of fulfilling the order, Banknote printed a sheet of Nixon stamps comprising inverts ("Nixon inverts"): The name Richard Nixon was printed upside down relative to the portrait of the former president. The press waste from the Nixon stamps, including the Nixon inverts, was consigned to the Banknote vault.

Robie was employed by Banknote at its Suffern, New York, facility while Banknote was producing the Nixon stamps there. His responsibilities included operating a cutting machine that prepared sheets of approved stamps to the specifications required for delivery to the Postal Service. In his capacity as a cutter, Robie had access to the vault where the press waste was stored. Witnesses saw him entering the vault while press waste from the Nixon stamps—including the Nixon inverts—was held there. In August 1995, the Postal Service authorized the destruction of the press waste resulting from production of the Nixon stamps, which would have included the Nixon inverts if Robie had not already removed them from the vault without authorization.

Stamp dealer William Langs frequently advertised in philatelic magazines seeking misprints. On March 19, 1995, Robie, himself a stamp collector, contacted Langs advising him that Robie would be obtaining some "error stamps," without identifying them. He asked Langs whether he was interested in purchasing them. Langs said he was.

The Postal Service began general distribution and sale of Nixon stamps on or about April 27, 1995. On that day, Robie again told Langs that Robie was going to have "error stamps" to offer Langs. Still, Robie did not say what stamps he had in mind.

On May 15, 1995, Robie and Langs met at a diner in New Jersey. Robie falsely told Langs that Robie would be obtaining some "upside down" Nixon stamps from a woman

in Virginia who had purchased the stamps at a Post Office. Later that day Robie sent Langs a facsimile of the Nixon inverts. Langs expressed an interest in purchasing them.

On June 10, 1995, Robie and Langs again met at the New Jersey diner. There, Robie traded 120 of the Nixon inverts to Langs for collectors' stamps with a catalog value of approximately $60,000. On June 26, after Robie complained about the value of the stamps he had received in the exchange, Langs gave him a $1,000 check and additional stamps with a retail value of approximately $4,000–$5,000.

In August 1995, Robie contacted Gary Posner, another stamp dealer, and told him about the Nixon inverts. Posner expressed interest in viewing them. Robie drove from New York to a New Jersey Turnpike rest stop where he showed Posner the remaining forty Nixon inverts and again falsely represented that they had been obtained from a woman who had purchased them at a Post Office in Virginia. Robie told Posner that Robie had sold 120 of the Nixon inverts to Langs but was unhappy doing business with him.

Posner took the forty Nixon inverts in exchange for $7,000 in cash and a collection of foreign postage stamps with a retail value of approximately $12,000–$15,000. The next day, Posner traded the inverts to Langs for other error stamps and early 19th century United States stamps with a total wholesale value of approximately $75,000 and a retail value of approximately $125,000. Langs later sold 141 of the Nixon inverts for $800,000 through an auction sale at Christie's, Inc., in New York City.

According to representations Robie made to the trial judge before sentencing, he eventually sold the stamp portion of the proceeds of the Langs sale for $10,450. He sold the stamp portion of the proceeds of the Posner sale for $3,188.75. Together with the $8,000 in cash that he received from Langs and

Posner, the total proceeds of his sale of the stamps, thus calculated, was $21,638.75.

Robie was arrested on December 12, 1996 and charged in a two-count indictment with theft of property made under contract for the United States in violation of 18 U.S.C. § 641, and transporting stolen property in interstate commerce in violation of 18 U.S.C. § 2314.[3] After a four-day trial in May 1997, the jury convicted Robie on both counts. Although the jury concluded that Robie had stolen the stamps from Banknote, there was no direct evidence to establish, and the jury did not find, precisely when or how the theft had taken place.

At Robie's sentencing on November 18, 1997, Judge Batts adopted the Presentence Report's findings of fact and its determination that Robie's criminal history category was I. Applying U.S.S.G. § 2B1.1, which governs both convictions for theft of goods made under contract for the United States and for interstate transportation of stolen goods, Judge Batts found that the base offense level of four should be increased to reflect the amount of loss caused by Robie's offense. Based on the trial testimony of Langs and Posner, Judge Batts determined that the actual value of the 160 Nixon stamps *to Robie* was $400 a stamp, for a total of $64,000, which required an increase of seven offense levels. With a resulting offense level of eleven, calling for a sentence of eight to fourteen months, the court sentenced Robie to a term of imprisonment of one year and one day to be followed by three years of supervised release, and a special assessment of $100. Robie filed a timely notice of appeal.

## DISCUSSION

### I. Sufficiency of the evidence under 18 U.S.C. § 641

Robie asserts that the evidence at trial was insufficient to sustain a felony conviction under 18 U.S.C. § 641 because it did not establish beyond a reasonable doubt that

---

**3.** Robie was not charged with "sell[ing], convey[ing] or dispos[ing] of" the property or "conceal[ing], or retain[ing] the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted"

under § 641. There is also no indication that he was ever prosecuted for having sold the Nixon inverts to the stamp dealers by knowingly misrepresenting that they had been issued by the Postal Service.

(1) the value of the Nixon inverts at the time they were stolen exceeded $100, or (2) the Nixon inverts were "property made . . . under contract for the United States." 18 U.S.C. § 641. Robie "carries a heavy burden in making" such a claim. *United States v. Morrison,* 153 F.3d 34, 49 (2d Cir.1998). We "must consider the evidence in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government, and we may overturn the conviction only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *Id.* (internal quotation marks and citations omitted).

*A. Valuation*

Robie does not challenge the jury's finding that he stole the Nixon inverts. The record does not disclose, and the jury made no finding, however, as to precisely when the theft took place. It is clear to us, as it must have been to the jury, only that the theft occurred sometime between January 1995 when, while Robie was employed by Banknote, Banknote began to work on the Nixon stamps, and May 15, 1995, when Robie sent stamp dealer Langs a facsimile depicting the misprinted stamps. During that period, Robie had access to the Nixon inverts at Banknote's Suffern facility.

■ As to the value of the goods stolen, "[f]or the offense proscribed by 18 U.S.C. § 641 to amount to a felony, there must be both charge and proof that the value of the property stolen . . . exceeds the sum of $100." *Theriault v. United States,* 434 F.2d 212, 214 (5th Cir.1970). The district court, without any objection from Robie, charged the jury that:

> The fourth element the Government must establish beyond a reasonable doubt is that the value of the stolen property exceeded $100. Value means the face, par or market value, or cost price, either wholesale or retail, whichever is greater.

> You should consider the aggregate, or total, value of the property referred to in the Indictment. If you find that the aggregate value of the property referred to in the Indictment is less than $100, then you must find the Defendant not guilty. If, on the other hand, you find that the aggregate value referred to is greater than $100, then this element is satisfied.

The jury found that the value of the Nixon inverts was more than $100.

Robie now argues that this finding was error. He contends that even if, as the jury found, he stole the Nixon inverts, they were at the time mere waste and therefore could not have met § 641's value requirement of more than $100. The government answers that the value of the Nixon inverts exceeded the statutory minimum because of their value on a "thieves' market" as evidenced by the amounts Robie received from their sale to Langs and Posner. We disagree that their value on a "thieves' market" was established. But we hold that Robie's knowledge that, with the right misrepresentation, the Nixon inverts might be sold for significant sums, his willingness to brave Banknote's security measures to obtain them, combined with the other circumstances of their theft and sale, permitted the jury to infer as it did that their value then exceeded the statutory threshold.

Robie argues that the Nixon inverts were worth $100 or less when stolen. Because the phosphor on the paper on which the Nixon inverts were printed was readable as first-class postage by the Postal Service's electronic postage recognition equipment, he says, it was good for sending 160 first-class letters through the United States mail. The stolen misprints' value was therefore 32¢ × 160 or $51.20, no more. He argues that at the time of theft the Nixon inverts could not have been worth the much higher amounts that Langs and Posner later paid for them or for which they in turn sold them because it was Robie's successful post-theft misrepresentations that they had been issued by the Postal Service that resulted in their fetching a five-figure price.

Robie cites *United States v. Kramer,* 289 F.2d 909 (2d Cir.1961) (Friendly, *J.*), in support of his argument. The *Kramer* defen-

dant had been convicted of conspiracy to break and enter into United States post offices with the intent to steal blank money-order forms, and conspiracy to receive, conceal and retain the forms with the intent to convert them. At a previous trial, however, the defendant had been acquitted on all counts of an indictment alleging substantive crimes arising from the same conduct. *Id.* at 912. On appeal, the defendant argued that his convictions were barred by the prohibition against double jeopardy and by collateral estoppel. This Court reversed the first two conspiracy convictions on collateral estoppel grounds but returned the case to the district court for a new trial on the charges relating to receipt of stolen goods under § 641, the same statute under which Robie was convicted here. *Id.* at 919–20. The Court canvassed the evidence as to the value of the stolen goods allegedly received because the issue of their valuation was likely to arise at the new trial.

The Court found that the printed legend on the money-order forms, "Maximum value one hundred dollars," did not bestow on each of them a "face value" of $100 with an aggregate value in excess of $100. *Id.* at 920. But, the Court said, § 641 prohibits more than the act of theft; it proscribes concealing or retaining the stolen goods with the requisite intent. "It is not essential that the stolen property be worth $100 at the moment of receipt; it is enough if there is evidence that the property had that value at some time when there occurred an offense defined in the statute, charged in the indictment, and proved by the evidence." *Id.* at 921. Sometime between Kramer's theft and the negotiation of the money-order forms, their forged completion gave them an aggregate value in excess of the statutory amount. "[T]here was ample evidence to warrant a conclusion that at some time while [the defendant] was concealing or retaining the money orders with intent to convert them to his own use, they attained a value of $100 in the aggregate." *Id.*

Robie's *Kramer*-based argument is that the misrepresentations by Robie that the Nixon inverts had been issued by the Postal Service are analogous to the forgeries on the *Kramer* money-order blanks. The money-order forms in *Kramer* were virtually worthless until the act of forgery gave them the requisite value; the misprinted stamps here were similarly nearly worthless until Robie's act of misrepresentation gave them substantial value. In *Kramer,* because the defendant was charged under the "concealing or retaining" language of § 641, the government needed to prove that *at any time* before the negotiation of the money orders, the forgery had given them the necessary added value. Here, because Robie was indicted only for theft under § 641 and not for "concealing or retaining" the stolen goods, the government was required to prove that the misprints were worth more than $100 *at the time they were stolen.* No direct evidence of valuation was adduced.

Robie relies also on the Ninth Circuit's decision in *United States v. Luckey,* 655 F.2d 203 (9th Cir.1981). There, the defendant had stolen a sample blank corporate check, entered the amount payable as $367.80, payable to himself, and forged the corporation's signature stamp, applying it to the check. He then negotiated it for the face amount. He was indicted, and convicted by a jury, of bank larceny in violation of 18 U.S.C. § 2113(b). Section 2113, like § 641, requires that the theft be of property "of value exceeding $100."

The Ninth Circuit reversed. It observed that, had the issue been possession or concealment, the eventual forgery in an amount exceeding $300 would have been enough to establish value in excess of $100, citing *Kramer. See id.* at 205. "But when the offense charged is the theft of property of a certain value, evidence must show the value of the property at the time of theft. . . . There is no evidence at all upon this question." *Id.* Absent such evidence and because of the inability of a jury to determine from its own experience what a blank check of the sort stolen by the defendant was worth, the jury finding that its value was more than $100 at the time of theft was "pure speculation." *Id.*

While both *Kramer* and *Luckey* are helpful to Robie, neither is dispositive. The *Kramer* court concluded not that the money orders

were worth more than $100 only at some time after their theft, but that their value was an issue for the trier of fact. "There is, of course, a certain incongruity in asking a jury to exercise such expertise in the ways of the underworld as to determine the 'value' of money orders that can be or have been forged; but the omniscience of the jury extends to harder questions than that." 289 F.2d at 921. We think, as we shall explain, that the issue of value was correctly left to the jury in Robie's case, too.

And in *Luckey*, there was no evidence presented to the jury as to the value of the stolen check-form at the time of its theft except for its later negotiation for $367.80. That fact *alone* was not enough to permit a jury to infer that the sample check was worth more than $100 when it was stolen. 655 F.2d at 205. Here, that the Nixon inverts were sold for a great deal of money after they were stolen may not *alone* have been enough to establish beyond a reasonable doubt that their value was above $100 at the time of theft. But that fact combined with other evidence was sufficient. The difference in circumstances between that case and this, as discussed below, transforms what was held to be speculation in *Luckey* into an inference that the jury was entitled to make in the case at bar.

■ The government, for its part, asserts that the substantial sums paid by the stamp dealers to Robie for the Nixon inverts, and even higher prices paid by subsequent purchasers for them, establish a value for the stolen stamps on a so-called "thieves' market" well above the statutory threshold. We have no doubt that the going price among the dishonest for ill-gotten merchandise can establish its value, as the cases in this circuit cited by the government confirm. *See United States v. Tyers*, 487 F.2d 828 (2d Cir. 1973), *cert. denied*, 416 U.S. 971, 94 S.Ct. 1995, 40 L.Ed.2d 560 (1974); *United States v. Bottone*, 365 F.2d 389 (2d Cir.), *cert. denied*, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966); *United States v. Kessler*, 253 F.2d 290 (2d Cir.1958). To be probative of the value of goods when stolen, however, the relevant value on a "thieves' market" is for those goods, not what they are later misrep-

resented or misunderstood to be. To paraphrase *Luckey*, the amount Langs and Posner were willing to pay was not evidence as to what the misprints unenhanced by Robie's fraudulent misrepresentation would have been worth on the "thieves' market," where the potential for fraud would have value to one capable of doing the defrauding. *See* 655 F.2d at 205.

The cases cited by the government are not to the contrary. In *Tyers*, 487 F.2d at 831, we held that the jury "could consider the 'street value' of [stolen] money orders in determining whether the value exceeded $100." *Id.* at 831. We do not now suggest otherwise. But the "street value" of a stolen money-order blank is not the amount a forger later chooses to insert on it. It is the amount potential forgers are willing to pay for the stolen blanks. *See Churder v. United States*, 387 F.2d 825, 833 (8th Cir.1968) (street value of stolen money-order blanks established). And in *Bottone*, 365 F.2d at 393, the willingness of drug manufacturers to pay "five and six figures" for stolen industrial secrets was relevant to the value of the secrets when they were stolen, but only because the purchasers knew the nature and quality of what they were buying.

Similarly, the price obtained by the defendant for stolen aluminum transported across state lines in *Kessler*, 253 F.2d at 291–92, did establish its value for purposes of the statute under which he was convicted. But the purchaser was not led to believe that what he bought was anything other than aluminum. Had the defendant sold the aluminum on the misrepresentation that it was silver, the sales price would not, we think, have established the value of stolen aluminum at the time of the theft. Just so in the case at bar. Misprinted postage-stamp press waste does not have a value of tens of thousands of dollars because press waste misrepresented to be issued inverts does.

■ We conclude nevertheless that the jury was within its province in deciding that the value of Nixon inverts exceeded $100 when Robie stole them. Robie was a stamp collector who knew the value of issued misprints. As early as March 19, 1995, when he enjoyed access to the vault from which he

took the Nixon inverts, he contacted stamp dealer Langs, who had been advertising for error stamps including inverts, and told him that he (Robie) would be offering error stamps. There was also evidence that on April 27, on or about the first day of the general issuance of the Nixon stamps by the Postal Service, Robie told Langs he would have error stamps to sell. Robie sent a facsimile of the Nixon inverts to Langs on May 15. And by June 10, Robie had traded 120 Nixon inverts to Langs for other stamps worth tens of thousands of dollars. At some point during this period, Robie put himself at considerable risk by stealing the Nixon inverts in the face of security measures used by Banknote to guard against just such theft. *Cf. Bottone*, 365 F.2d at 393 (taking into account defendants' "eager[ ] invest[ment of] a large portion of their time" stealing and selling industrial secrets in valuing the stolen material). From all this, the jury could properly conclude that, whenever it was that Robie made off with the Nixon inverts, he was aware that he might ·well be able to resell them for many times their nominal value of $51.20 and far in excess of $100.

What a thief thinks the property he is stealing is worth does not *alone* establish its value. One who steals rhinestones thinking they are diamonds is surely held to account for the theft of baubles not gems. Neither, as we have seen, does the inverts' ultimate sales price *alone* establish their worth at the time of theft. When stolen they were mere press waste that might or might not one day be fraudulently sold dear. And the existence of a "thieves' market" for unissued inverts, let alone a valuation of the Nixon inverts on such a market, was not proved and cannot therefore be used to show value.

But the jury was entitled to consider the evidence as a whole. The inverts were indeed ultimately sold for tens of thousands of dollars; Robie was apparently aware at the time of theft that they might be. He braved the risk of exposure by Banknote's intensive security measures; it is difficult to imagine he would have done so in order to retrieve what he thought to be refuse. Because the jury could conclude that the stamps were highly valuable to Robie, it could infer that they would have a similar market value among persons also inclined to misrepresent the stamps as issued; that their value on a "thieves' market," had there been one, would have been well in excess of the threshold amount. In the aggregate, these permissible inferences were more than sufficient to permit the jury to conclude that the government had proved beyond a reasonable doubt that, for purposes of § 641, the Nixon inverts had a value of more than $100 when they were stolen.

### B. "Made under contract . . . for the Postal Service"

■ Robie argues that "the evidence was insufficient to establish that the misprinted stamps were property made . . . under contract for the United States" under 18 U.S.C. § 641 at the time of their theft. We disagree.

The misprints fall squarely within the plain meaning of the statutory language. They were produced for the government solely and literally "under contract for" the Postal Service. Although as misprints they were useless to the Postal Service, it does not follow that they were not made under that agreement.

■ That goods stolen were at one time made under government contract is not alone enough to establish the offense, however. Stamps lifted by a pickpocket on a city bus were once "made under contract for the Postal Service," but the theft is not a federal crime. To implicate § 641, we think, there must be sufficient connection between the stolen property and the government to invoke federal criminal law.

That connection was present here. From the moment preparation for production of the Nixon stamps began until the press waste it generated was destroyed, the entire process was supervised by the government in accordance with the contract between the government and Banknote. Such controls provided, to borrow a term that the Fourth Circuit applied in interpreting another provision of § 641, sufficient "federal character" to implicate the statute. *United States v. Littriello*, 866 F.2d 713, 715–16 (4th Cir.1989). Mis-

printing a sheet of stamps did not remove the resulting waste from the aegis of the government or its contract with Banknote. The government retained dominion over the misprints at the time of their theft.

Robie relies principally on *United States v. Hartec Enters., Inc.*, 967 F.2d 130 (5th Cir. 1992). It does not help him. *Hartec* also involved a prosecution under 18 U.S.C. § 641. There the similarity ends. *Hartec* was decided under different statutory language giving rise to an issue different from that presented on this appeal.

In *Hartec*, the defendant, a government contractor, declared that metal used in its manufacture of products for the government, which had been paid for by government progress payments, was scrap, and sold it. The defendant was indicted and convicted for theft of government property—the scrap—under § 641. The question for the court was whether, under applicable federal acquisition regulations, the scrap was owned by the government when the contractor disposed of it. *See id.* at 131.

The Fifth Circuit concluded that the government held a security interest rather than an ownership interest in the material and that, in any event, the rule of lenity would apply to characterize the government's stake as a mere security interest for purposes of applying this criminal statute. The material sold did not belong to the government and, it followed, could not have been stolen from the government. *Id.* at 133–34. But the issue in Robie's case, whether the unusable material was "made or being made under contract" for the government, never arose.[4]

## II. Robie's conduct under 18 U.S.C. § 2314

### A. *Valuation*

■ Robie was also charged with and convicted of "transport[ing] and transfer[ring] in interstate commerce goods, wares and merchandise of the value of $5,000 and more" in violation of 18 U.S.C. § 2314. Whether the Nixon inverts were worth "$5,000 and more" when Robie transported them across the New York/New Jersey state line is a question plainly related to that of their value when he stole them, addressed above, and is subject to the same standard of review. It is, however, more easily resolved.

The jury was instructed, without objection:

In determining the value of the property, you may look at the face or par value of the property or its market value, that is, the amount of money the property could be sold for in the open market. You should consider the aggregate, or total value of the property referred to in the Indictment. If you find that the aggregate value of the property referred to in the Indictment is less than $5,000, then you must find the Defendant not guilty. If, on the other hand, you find that the aggregate value referred to is greater than $5,000, then this element is satisfied.

The jury found for the government.

For the reasons that we have concluded that the jury could determine that the press-waste inverts were worth upwards of $100 when stolen, it also properly could conclude that they were worth $5,000 or more when later taken across state lines to be sold. Both the apparent value of the inverts in light of Robie's ultimate scheme to misrepresent them as having been issued and the risks he took to obtain them properly could have led the jury to that view.

The keystone to Robie's argument that the stamps had little value at the time of their theft, moreover, is that two separate events were necessary to make them salable at five and later six-figure prices: (i) their acquisition by Robie and (ii) his subsequent successful misrepresentation to stamp dealers that

---

4. Although the indictment in the case at bar described the Nixon inverts as "property of the United States Postal Service," that description was not material for purposes of prosecuting the offense alleged and is not a necessary element for a conviction under § 641. Accordingly, we need not address the *Hartec* issue of whether the government proved such ownership. *See United States v. Miller*, 471 U.S. 130, 136, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985) ("A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as 'a useless averment' that 'may be ignored.' " (quoting *Ford v. United States*, 273 U.S. 593, 602, 47 S.Ct. 531, 71 L.Ed. 793 (1927))).

they were issued inverts. The jury could properly conclude that by the time they were transported across state lines for sale, in contrast to the time of their theft, the misrepresentation as to their issuance had been accepted by Langs and Posner. Both events necessary to give the Nixon inverts substantial value had taken place. The jury could thus infer that the group of 120 stolen Nixon inverts Robie delivered to Langs on June 10 and the group of forty stolen Nixon inverts he delivered to Posner in August were each worth more than $5,000 when Robie crossed the state line to deliver each batch of stamps in violation of § 2314.

### B. "Spurious Representation" Exception

■ Section 2314 excludes from prosecution "any falsely made, forged, altered, counterfeited or spurious representation of an obligation or other security of the United States." 18 U.S.C. § 2314. Robie contends that, because he misrepresented to Langs and Posner that the Nixon inverts had been issued by the Postal Service, they were "spurious representations" of genuine United States postage and thus fall within this statutory exception.

The Nixon inverts were precisely what they appeared to be—misprinted stamps. The spurious—in the sense of "false"—representation was what Robie said to the stamp dealers as to the stamps' provenance. *Cf. United States v. Kenngott* 840 F.2d 375, 381 (7th Cir.1987) ("[T]he term 'spurious representation' does not refer to fraudulent statements."). This misrepresentation by Robie *about* the Nixon inverts did not turn the stamps themselves into "spurious representations."

The reason for the "spurious representation" exclusion to § 2314 is that trafficking in counterfeits, forgeries and spurious representations of obligations of the United States is made criminal elsewhere in the United States Code by anti-counterfeiting statutes. *See, e.g.,* 18 U.S.C. §§ 471, 473. Those laws are not made under the Commerce Clause and therefore have a broader reach than

§ 2314, not requiring interstate transportation as an element of the crime. *See United States v. Galardi,* 476 F.2d 1072, 1078 (9th Cir.), *cert. denied,* 414 U.S. 856, 94 S.Ct. 160, 38 L.Ed.2d 106, *and cert. denied,* 414 U.S. 839, 94 S.Ct. 90, 38 L.Ed.2d 75 (1973). Section 2314 is not needed to prevent or punish such misbehavior.

If the "spurious representation" exception were applicable to the Nixon inverts because they were falsely represented to have been issued by the Postal Service, their transportation across state lines would not have been a crime under § 2314 because of the exception. It would also not have been a crime under § 473 because the Nixon inverts were not "false, forged, counterfeited, or altered obligation[s] . . . of the United States" under § 473.[5] The interpretation Robie urges would thus "place a large, unintended gap in the statutory scheme." *Kenngott,* 840 F.2d at 382. We do not read the exception to have done so.

Additionally, the Nixon inverts were not "obligations of the United States" in the sense contemplated by the statute. Robie was a stamp collector and Langs and Posner were stamp dealers. The bartering among them was for the commercial purpose of enhancing the value of their respective stamp collections. In *United States v. Katz,* 535 F.2d 593, 596 (10th Cir.), *cert. denied,* 429 U.S. 895, 97 S.Ct. 255, 50 L.Ed.2d 178 (1976), the Court of Appeals for the Tenth Circuit rejected the defendant's assertion that a stolen stamp collection fit within the exclusionary clause of § 2314. Although the court had other reasons for rejecting the defendant's argument, it noted that, in general, "a stamp collection . . . comes well within the meaning of the phrase 'goods, wares and merchandise,' as that phrase is used in [§ 2314]. . . . A stamp collection, as such, is not in our view [an obligation of the United States] within the exclusion clause. . . ." *Id.* at 596. The same logic applies here.

### III. Robie's Sentence

United States Sentencing Guideline § 2B1.1, which applies to both of Robie's

---

5. 18 U.S.C. § 473 proscribes "buy[ing], sell[ing], exchang[ing], transfer[ring], receiv[ing], or deliver[ing] any false, forged, counterfeited, or altered obligation or other security of the United States. . . ."

convictions,[6] carries a base offense level of four and provides for an increase in offense level commensurate with the "loss" resulting from the defendant's offense. Under this Guideline, loss is defined as "the value of the property taken, damaged, or destroyed." U.S.S.G. § 2B1.1 comment. (n.2). Judge Batts determined that the loss enhancement provision applied and calculated the "actual value of the 160 stamps to the defendant" to be "approximately $400 a stamp, which amounts to $64,000." This increased Robie's Guideline range by seven offense levels to eleven which, when combined with his criminal history category of I, required a sentence of eight to fourteen months. Judge Batts sentenced Robie within that range to a term of a year and a day.

Robie asserts on appeal that the district court should not have applied the loss enhancement provision to his sentence at all because his offense did not cause any actual economic loss. Specifically, Robie claims that the victim of his crime was the United States Postal Service and that the Postal Service suffered no economic loss because it would have destroyed the Nixon inverts had Robie not stolen them. Under this analysis, Robie's offense level of four would have resulted in a sentencing range of zero to six months. He also argues that, if the enhancement provision is applicable to his sentence, the proper measure is the value Robie ultimately obtained for the inverts, which, at $21,638.75, would have resulted in a loss enhancement of only six levels and a sentencing range of six to twelve months. *See* U.S.S.G. §§ 2B1.1, 5A (Table).

Robie did not make these arguments in the district court. " 'Generally, issues not raised in the trial court, including sentencing issues, will be deemed waived on appeal in the absence of plain errors or defects affecting substantial rights.' " *United States v. Margiotti*, 85 F.3d 100, 104 (2d Cir.) (quoting *United States v. Liebman*, 40 F.3d 544, 551 (2d Cir.1994)), *cert. denied*, —— U.S. ——, 117 S.Ct. 324, 136 L.Ed.2d 238 (1996). We find, however, that the issue here falls within the exception to this rule " 'warranted

for novel or complex sentencing issues.' " *Id.* (quoting *Liebman*, 40 F.3d at 551); *see* Frank O. Bowman, III, *Coping with "Loss": A Re-examination of Sentencing Federal Economic Crimes Under the Guidelines*, 51 Vand. L.Rev. 461, 464–65 (1998) (discussing the "overall sense of uncertainty, confusion, and sheer aggravation" that arises whenever lawyers or judges grapple with "loss" under the Guidelines). We therefore proceed to the merits of Robie's claims.

The difficulty with the district court's approach below arises out of the Presentence Report's factual findings, which it explicitly adopted, that the Postal Service was the victim of Robie's crimes but suffered no "direct" loss as a result. The district court therefore substituted for loss to the Postal Service the value of the stamps to the defendant, which she concluded was $64,000, and imposed a sentence enhancement on that basis. While substitution of the defendant's gain for the victim's loss may in some circumstances be appropriate, it is difficult to see how the value of the Nixon inverts to Robie, who wanted them in order to commit fraud, helps place a value on them for purposes of evaluating the amount of the loss to the Postal Service, which had no use for them beyond their destruction. If there was no economic loss to the Postal Service, there was no "loss" for Guidelines purposes. *See United States v. Chatterji*, 46 F.3d 1336, 1340 (4th Cir.1995) ("[G]ain is only an alternative measure of some actual, probable, or intended loss; it is not a proxy for loss when there is none."); *United States v. Andersen*, 45 F.3d 217, 221–22 (7th Cir.1995) (where there is no evidence of financial loss, sentencing enhancement based on defendant's gain is not appropriate).

While we must therefore return the case to the district court for resentencing, we note that, under the Guidelines, "where the [theft] loss determined under subsection (b)(1) does not fully capture the harmfulness of the conduct, an upward departure may be warranted." U.S.S.G. § 2B1.1, comment. (n. 15). The Guidelines provide an example of

---

**6.** U.S.S.G. § 2B1.1 applies to "Larceny, Embezzlement, and Other Forms of Theft; Receiving, Transporting, Transferring, Transmitting, or Possessing Stolen Property."

property within this classification: "personal information or writings (*e.g.*, medical records, educational records, a diary) [the theft of which] may involve a substantial invasion of a privacy interest that would not be addressed by the monetary loss provisions of subsection (b)(1)." *Id.* Theft of the Nixon inverts is roughly analogous because of the real but intangible loss in the form of embarrassment and the appearance of incompetence inflicted on the Postal Service as a result. The district court may find an upward departure warranted on that basis.

 We note further that the frauds apparently perpetrated by Robie on stamp dealers Langs and Posner, although not separately prosecuted, may constitute relevant, uncharged conduct pursuant to U.S.S.G. § 1B1.3(a)(1)(A). The stamp dealers' loss was substantial and the district court may consider such loss when calculating Robie's base offense level. *See United States v. Zagari,* 111 F.3d 307, 322–23 (2d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 445, 139 L.Ed.2d 381 and *cert. denied,* —— U.S. ——, 118 S.Ct. 455, 139 L.Ed.2d 390 (1997).

Finally, under familiar principles, "[a] sentencing court may depart from the Guidelines if 'the court finds that there exists an aggravating or mitigating circumstance of [a] kind, or to a degree, not adequately taken into consideration by the Sentencing Commission.'" *United States v. Bauers,* 47 F.3d 535, 538 (2d Cir.1995) (quoting 18 U.S.C. § 3553(b)).

### CONCLUSION

We affirm Robie's conviction under 18 U.S.C. § 641 and his conviction under 18 U.S.C. § 2314, and we vacate his sentence and remand to the district court for resentencing in accordance with this opinion.