**UNITED STATES of America**

v.

**Juan GALVEZ.**

**No. 00–0073–CR.**

United States District Court,
S.D. Florida,
Miami Division.

Aug. 7, 2000.

Jennifer Lovemore, Assistant U.S. Attorney, for Plaintiff.

Mario Cano, Coral Gables, FL, for Defendant.

## SENTENCING ORDER

JORDAN, District Judge.

Juan Galvez pled guilty to conspiring to steal goods from a conveyance in interstate commerce in violation of 18 U.S.C. § 371 and 18 U.S.C. § 659. For sentencing purposes, Mr. Galvez' offense level must be determined with reference to the "loss" his crime caused. *See* U.S.S.G. §§ 2X1.1(a) & 2B1.1(b)(1).

### I. Facts

Mr. Galvez, a truck driver, participated in a scheme to steal 26 pallets of designer perfume that he was hired to transport from Miami, Florida, to Jersey City, New Jersey. The shipper, Perfumania, Inc.—a wholesale supplier—purchased the subject perfume for about $540,000 from the manufacturer, Parloux's Fragrances, and resold it to Dream & Beauty Enterprises, Inc., a wholesale distributor, for about $731,000. *See* Affidavit of Anil K. Monga, President, Dream & Beauty Enterprises [D.E. 163] (June 22, 2000). Based on the manufacturer's suggested retail prices for the various items comprising the shipment, the merchandise had a total retail value of about $2.6 million. *See* Government's Filing of Spreadsheet [D.E. 164] (June 22, 2000).

After Mr. Galvez and his cohorts offloaded the cargo at a Miami warehouse, Mr. Galvez drove north to the Orange City area. There, he bound himself with duct tape and stayed in the sleeper section of his trailer where police eventually discovered him. Mr. Galvez told the police that he had been hijacked at gunpoint.

The next day, law enforcement agents, who had been tipped off to the scheme, recovered 15 of the 26 stolen pallets. Dream & Beauty had paid about $493,000 for the recovered merchandise, which had a combined retail value of approximately $1.8 million. Dream & Beauty filed an insurance claim with Perfumania for about

$238,000, the balance of the amount it paid. *See* Monga Affidavit, Exhibit D, Insurance Claim (Feb. 9, 2000).

## II. Issue

The issue in this case is whether the relevant market for the stolen perfume is the wholesale perfume market or the retail perfume market. The government objects to the probation office's recommendation that I sentence Mr. Galvez based on the perfume's wholesale market value, contending that the retail market value should be used instead. *See* Government's Objection to Presentence Investigation Report [D.E. 168] at 1–2 (June 28, 2000). At sentencing, Mr. Galvez' counsel argued that the perfume's fair market value under the circumstances of this case is its wholesale market value. The evidence presented establishes only that Dream & Beauty paid $731,000 for the perfume and that it had a cumulative suggested retail value of about $2.6 million.

## III. Analysis

The Sentencing Guidelines define "loss" as "the value of the property taken, damaged, or destroyed." U.S.S.G. § 2B1.1 comment. (n.2). This definition begs the question of what the "value" of the property is. The Sentencing Guidelines do not provide a generally applicable formula for determining value:

> Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim.

*Id.* To sentence Mr. Galvez, I must determine whether this is an ordinary case where "loss" is equal to the fair market value of the stolen property. If so, I must determine what the fair market value of the stolen perfume is. If that value is difficult or impossible to determine, I must adopt another loss figure grounded in the evidence presented. *See* U.S.S.G. § 2B1.1 comment. (n.2).

It is the unusual theft case in which loss is not determined with reference to the fair market value of the subject property. For example, in *United States v. Robie,* 166 F.3d 444, 454–56 (2d Cir.1999), the defendant was convicted of stealing misprinted Richard Nixon postage stamps in violation of 18 U.S.C. § 641 and of transporting them across state lines in violation of 18 U.S.C. § 2314. The defendant was an employee of Banknote Corporation of America, which prints postage stamps for the government, and he stole the stamps, which were to be destroyed, from the company's vault. The Second Circuit affirmed the jury's finding that the stamps were worth more than $100 under § 641 at the time they were taken, even though they were considered trash by their owner, the United States Postal Service. *See* 166 F.3d at 452. It also affirmed the finding that the stamps were worth more than $5,000 when the defendant transported them across state lines because, by then, he had increased their value by misrepresenting to a dealer that the stamps had been inadvertently issued by the Postal Service. *See id.* at 453–54. Despite these findings on value, the Second Circuit reversed the district court's sentence, holding that there was no loss under the Guidelines:

> While substitution of the defendant's gain for the victim's loss may in some circumstances be appropriate, it is difficult to see how the value of the Nixon inverts to Robie, who wanted them in order to commit fraud, helps place a value on them for purposes of evaluating the amount of the loss to the Postal Service, which had no use for them beyond their destruction. If there was no economic loss to the Postal Service, there was no "loss" for Guidelines purposes.

*Id.* at 455 (citations omitted).

This case presents no such complexity. Rather, there is every reason to believe

that this case typifies what the Sentencing Commission would consider an ordinary theft case. Indeed, the parties do not dispute that the loss to Dream & Beauty is equal to the fair market value of the perfume.

The fair market value of property can be determined only with reference to a relevant market, which may be wholesale or retail in nature and which may, depending on the specific facts of the case, be narrowed to a particular wholesale or retail segment. Courts calculating loss for sentencing purposes uniformly hold that the fair market value of stolen property is the price a willing buyer would pay a willing seller at the time and place of the offense. *See, e.g., United States v. Eyoum*, 84 F.3d 1004, 1007–08 (7th Cir.1996) (affirming sentencing under U.S.S.G. § 2Q2.1 based on retail value of legitimately acquired pancake tortoises rather than actual price at which smuggler sold them); *United States v. Williams*, 50 F.3d 863, 864 (10th Cir.1995) (affirming loss calculation based on retail rather than wholesale value of jewelry stolen from retail store); *United States v. Warshawsky*, 20 F.3d 204, 213–14 (6th Cir.1994) (reversing sentence based on retail price of stolen auto parts where evidence was that defendants operated exclusively in wholesale market); *United States v. Arjoon*, 964 F.2d 167, 168, 172 (2d Cir.1992) (holding that loss value for sentencing purposes was value of stock at time it was embezzled, not sold); *United States v. Larracuente*, 952 F.2d 672, 674 (2d Cir.1992) (affirming sentence based on retail price of legitimate video tapes rather than price at which defendant sold pirated videotapes because quality of pirated tapes was sufficient to allow them to be sold through normal retail outlets). *Cf. United States v. Trupin*, 117 F.3d 678, 688 (2d Cir.1997) (affirming district court's determination of loss for possession of stolen painting at $100,000—the 1978 purchase price—rather than $1 million—the painting's value at the time of arrest in 1990—but implying that, in possession decisions, district courts might choose from range of loss figures). These cases build on the reasoning of pre-Guidelines cases in which the "value" of stolen property was relevant to whether the defendant was properly charged under a given statute. *See United States v. Bakken*, 734 F.2d 1273, 1278–80 & nn. 8 & 10 (7th Cir.1984) (holding in prosecution for interstate transportation of stolen goods that relevant market was wholesale rather than retail and fair market value was price willing buyer would pay willing seller); *United States v. Berkwitt*, 619 F.2d 649, 657–58 (7th Cir.1980) (holding that relevant market for pirated eight-track tapes was retail black market or "thieves' market" because willing buyers would pay less for pirated tapes than for legitimate recordings); *Gaither v. United States*, 413 F.2d 1061, 1075 (D.C.Cir.1969) (noting in grand larceny case that fair market value could not be ascertained without reference to either wholesale or retail relevant market but holding that defendant was not prejudiced by indictment based only on retail value where wholesale value was also sufficient to support charge).

The Guidelines state that "the loss need not be determined with precision," U.S.S.G. § 2B1.1 comment. (n.3), and courts have held that a reasonable estimate of loss is sufficient to support a sentence. *See, e.g., United States v. Lopez*, 64 F.3d 1425, 1427 (9th Cir.1995). While the Supreme Court recently observed that "[a]ny possible distinction between an 'element' of a felony offense and a 'sentencing factor' was unknown to the practice of criminal indictment, trial by jury, and judgment by the court as it existed during the years surrounding our Nation's founding[,]" the Court also emphasized that "nothing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute." *Apprendi v. New Jersey*, —— U.S. ——, ——, ——, 120 S.Ct. 2348, 2356, 2358, 147 L.Ed.2d 435

(2000). It is undisputed that the maximum prison sentence for Mr. Galvez' crime is 10 years. *See* 18 U.S.C. § 659. The amount of loss in this case therefore only guides the exercise of my discretion in imposing a sentence within this range. It does not affect the potential sanction imposed by statute for Mr. Galvez' offense. Consequently, the amount of loss need not be proved beyond a reasonable doubt. Nonetheless, the amount of loss should be determined in as principled and accurate a manner as circumstances permit to "provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct . . . ." 28 U.S.C. § 991(b)(1)(B).

Because the perfume that Mr. Galvez helped steal was packaged in wholesale lots and owned by a wholesale dealer at the time of the offense, the relevant market for valuation is the wholesale market. *See Warshawsky,* 20 F.3d at 213. In other words, the fair market value is the amount a willing buyer would pay Dream & Beauty, the relevant willing seller, for the wholesale lots of perfume. The government, however, has presented no evidence as to the amount that a willing buyer would have paid Dream & Beauty for the subject perfume, and Eleventh Circuit caselaw expressly precludes speculation on such sentencing issues. *See United States v. Wilson,* 993 F.2d 214, 218 (11th Cir. 1993) (citing *United States v. Patrick,* 983 F.2d 206, 209–11 (11th Cir.1993)). The manufacturer's suggested retail price, which the government contends should form the basis of loss in this case, bears no relationship whatsoever to the charged offense. "Indeed," as in *Warshawsky,* "none of the participants in this case ever handled [the stolen property] outside of the wholesale market." 20 F.3d at 213.

The only support for the government's position that the retail value of the perfume be used as the "loss" figure under the Sentencing Guidelines despite the fact that Mr. Galvez helped steal the perfume from a wholesaler is *United States v. Watson,* 966 F.2d 161 (5th Cir.1992). In *Watson,* which also involved a theft of cargo from a truck, the Fifth Circuit affirmed the district court's use of a retail price figure for sentencing, reasoning that " 'use of wholesale as opposed to retail value would only encourage disparate sentencing for essentially similar criminal acts, especially in cases involving stolen property with several tiers of distribution." 966 F.2d at 163 (quoting *United States v. Russell,* 913 F.2d 1288, 1293 (8th Cir.1990)). This concern, however, is grounded on the false assumption that all acts of theft involving similar property are also "similar" for sentencing purposes.

For better or worse, in cases relating to stolen property, the Guidelines impose punishment based on the value—and not the nature—of the property. Thus, whether criminal acts relating to stolen property are "similar" and should therefore be similarly punished depends not on what is stolen, but on what the property was worth at the time of the offense. Thus, as the courts cited above have recognized, the phrase "fair market value" does not refer to the value of property in any conceivable market in which it may eventually wind up but to the market in which the property *actually was* when the offense occurred. The former Fifth Circuit recognized this economic fact in *United States v. Perry,* 638 F.2d 862, 864 (5th Cir. Unit A March 1981), which held that the value of property stolen from a wholesale distributor is the price at which the wholesaler would sell the property:

> [I]t seems apparent that the market value of goods stolen in wholesale lots from a wholesaler would be the price at which the wholesaler would sell them. With regard to the cashews involved here, for instance, a buyer would be willing to buy a case of cashew nuts (containing 144 small packages) at its wholesale price of $17.28, but he would not likely be willing to purchase a case containing 144 small

packages of cashews at the cumulative sum of the retail price of 25 cents per package that each consumer purchasing a single package would pay *i.e.* a total of $36 for the case instead of its wholesale price of $17.28.

638 F.2d at 866.

It is true that this approach creates the possibility that two defendants who steal the same property may receive disparate sentences. For example, suppose that the perfume recovered from Mr. Galvez and his confederates finds its way to a department store where it is stolen again from the display case. The individual committing that crime would be sentenced according to the perfume's retail value. This may seem unfair, but that result is a function of the Sentencing Commission's premise that sentences should be dependent on the dollar value of stolen property. To be sure, the Commission could have adopted a schedule of punishment according to the nature of the property stolen—whether it were perfume, clothing, electronics, commercial paper, currency, jewelry, foodstuffs, livestock, or whatever—but that choice would no doubt present problems of its own. On the other hand, it is not difficult to imagine good reasons why stealing from a retailer should be subject to a harsher penalty. For one thing, the retailer would have paid more for (or invested more in) the perfume than the wholesaler, thereby incurring a greater loss.

In any event, the choice has been made. Under the Sentencing Guidelines, it is not important that all who steal 144 small packages of cashews receive the same punishment. Rather, it is important that all who steal something worth $17.28 receive the same punishment.

The government's contention that Mr. Galvez should be sentenced based on the manufacturer's suggested retail price for the perfume he helped to steal cannot be supported. The retail market for perfume has nothing to do with this case because, at the time it was taken, the subject property was packaged, priced, and traded in the wholesale market. What the ultimate consumers would each pay retailers for a bottle of the designer perfume that Mr. Galvez helped steal is unknown at this point in time and the manufacturer's suggestion is both too attenuated and too speculative to support a criminal sentence.

The evidence establishes only that Perfumania paid about $540,000 for the perfume and sold it to Dream & Beauty for about $731,000. After the theft, authorities recovered about $493,000 worth of the perfume and Dream & Beauty made an insurance claim for the difference of approximately $238,000. While the insurer is out of pocket $238,000, "loss" under § 2B1.1 is not necessarily the same as the harm suffered by the victim. The wrongdoer must be punished for his act and not for the harm he actually (or ultimately) causes. Thus, the Second Circuit held in *Arjoon* that a convicted embezzler should be sentenced according to the value of all 5,000 shares of stock he stole, even though he returned 2,000 shares before the crime was detected. 964 F.2d at 172. " 'Loss' is, therefore, not the ultimate harm suffered by the victim, but is rather the value of what was taken." *Id.* The Eleventh Circuit followed *Arjoon* in *United States v. Bald,* 132 F.3d 1414 (11th Cir.1998), a case in which the defendants were convicted of credit card fraud. The defendants had made hundreds of thousands of dollars of purchases using credit cards that were not theirs. On appeal from their sentence, they argued that, because they had returned $35,786.54 worth of merchandise for credit before the crime was detected, that amount should have been excluded in determining loss. *See id.* at 1416. Analogizing the unauthorized credit card use to theft and relying on *Arjoon,* the Eleventh Circuit affirmed the sentences for the full amount of the merchandise unlawfully purchased, including the returns. *See id.* at 1416–17 & n. 3. These cases, however, are consistent with the view that value should be determined from the victim's perspec-

tive at the time of the offense. The stolen stock in *Arjoon* was worth $489,000 at the time it was taken and the unauthorized purchases in *Bald* were worth retail value to the victim at the time they were made. For that reason, the loss figure under the Guidelines may sometimes exceed the amount of restitution.

## IV. Conclusion

In determining Mr. Galvez' loss figure, I consider all 26 pallets of perfume that he participated in stealing, even though 15 of those were recovered and subsequently sent to Dream & Beauty. While Dream & Beauty presumably intended to distribute the perfume at a profit, I have no basis for determining with any degree of accuracy or fairness what that profit might be and, therefore, no basis for knowing what a willing buyer would have paid Dream & Beauty. Instead, I follow the Sentencing Commission's suggestion that, where the fair market value is unknown or unknowable, the victim's reasonable replacement cost may be used as a loss figure. Had Mr. Galvez and the other defendants succeeded, Dream & Beauty could presumably have replaced the shipment by paying another $731,000. The loss figure for calculating Mr. Galvez' sentence is therefore $731,000.