[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-15721
_____

D.C. Docket No. 1:15-cr-00277-SCJ-JFK-2


UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JUAN CARLOS BAZANTES,
CESAR ARBELAEZ TABARES,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(October 26, 2020)

Before BRANCH, TJOFLAT, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Two men owned a company that was a second-tier subcontractor on a project to construct a building for a federal agency. They submitted to the agency certified payroll forms containing false, fictitious, and fraudulent statements and entries within the meaning of 18 U.S.C. § 1001(a)(3). That provision is part of the False Statements Act. The men were convicted of conspiring to violate, and of knowingly and willfully violating, the Act. This is their appeal.

Given the elements of the crime, the facts of the case, and the contentions of the defendants, there are two primary questions about the validity of the convictions. One is whether the payroll forms containing the false statements were made or used in a matter within the jurisdiction of the federal agency. The other question is whether the false statements were material. If the answer to either question is no, the convictions must be reversed. If the answer to both questions is yes, the convictions must be affirmed. The answers are "yes" and "yes."

Arbelaez and Bazantes also challenge their sentences, questioning whether the district court in determining their guidelines ranges properly calculated the loss caused by their crimes. Because the answer to that question is "no," their sentences must be vacated and their cases remanded for resentencing.

I. THE FACTUAL, STATUTORY, AND REGULATORY BACKGROUND

Construing the evidence in the light most favorable to the verdict, as we are required to do, the facts are these. See United States v. Hansen, 262 F.3d 1217, 1236 (11th Cir. 2001).

Cesar Arbelaez Tabares and Juan Carlos Bazantes founded, owned, and managed IWES Contractors, Inc., a drywall contracting company. It acted as a "labor broker," providing skilled drywall installation workers to construction companies. One of the construction projects IWES provided workers for was a $63 million office building in Atlanta for the Centers for Disease Control and Prevention (CDC), a federal agency.

The Beck Group was the prime contractor on that federal construction project. Beck contracted with Mulkey Enterprises as a first-tier subcontractor that would, among other things, install the drywall. And Mulkey hired IWES as a second-tier subcontractor to provide Mulkey with drywall workers for the job. So IWES was a subcontractor for Mulkey, Mulkey was a subcontractor for Beck, and Beck was the prime contractor for the CDC.

A.  The Statutory and Regulatory Background

Federal construction projects are, of course, heavily regulated by a web of statutes and regulations. The Davis-Bacon Act of 1931, for example, requires government contractors and subcontractors to pay their workers at least the prevailing wage in the community where the construction occurs. Pub. L. No. 71–

3

798, ch. 411, 46 Stat. 1494 (codified at 40 U.S.C. §§ 3141–44, 3146–47).  The

Copeland "Anti-Kickback" Act of 1934 forbids government contractors and

subcontractors from requiring any worker on a federal project "to give up any part

of the compensation to which he is entitled under his contract of employment."

Copeland Act, ch. 482, § 2, 48 Stat. 948, 948 (1934) (codified at 18 U.S.C. § 874

and 40 U.S.C. § 3145).  In that way it complements the Davis-Bacon Act.

One subsection of the Copeland Act, which is now codified in 40 U.S.C.

§ 3145, directs the Department of Labor to promulgate implementing regulations

and provides that:  "The regulations shall include a provision that each contractor

and subcontractor each week must furnish a statement on the wages paid each

employee during the prior week."  Id. at § 3145(a).  The very next subsection of

the statute, which Congress added in 1958, states with concise clarity that:

"Section 1001 of title 18 applies to the statements" that contractors and

subcontractors must furnish.  Id. § 3145(b).

In obedience to the Copeland Act's statutory mandate, the Department of

Labor adopted 29 C.F.R. § 3.3 ("Weekly Statement with Respect to Payment of

Wages"), which requires that:

> Each contractor or subcontractor engaged in the construction,
> prosecution, completion, or repair of any public building . . . shall
> furnish each week a statement with respect to the wages paid each of
> its employees . . . during the preceding weekly payroll period.  This
> statement shall be executed by the contractor or subcontractor or by an
> authorized officer or employee of the contractor or subcontractor who

4

supervises the payment of wages, and shall be on the back of Form WH 347, "Payroll (For Contractors Optional Use)" or on any form with identical wording.

Id. § 3.3(b).  That regulation is followed by another, § 3.4 ("Submission of Weekly Statements and the Preservation and Inspection of Weekly Payroll Records"), which requires that:

> (a) Each weekly statement required under § 3.3 shall be delivered by the contractor or subcontractor . . . to a representative of a Federal or State agency in charge at the site of the building or work . . . .  After such examination and check as may be made, such statement, or a copy thereof, shall be kept available, or shall be transmitted together with a report of any violation, in accordance with applicable procedures prescribed by the United States Department of Labor.
>
> (b) Each contractor or subcontractor shall preserve his weekly payroll records for a period of three years from date of completion of the contract.  The payroll records shall set out accurately and completely the name and address of each laborer and mechanic, his correct classification, rate of pay, daily and weekly number of hours worked, deductions made, and actual wages paid.  Such payroll records shall be made available at all times for inspection by the contracting officer or his authorized representative, and by authorized representatives of the Department of Labor.

Id. § 3.4.

Two other regulations implementing both the Copeland Act and the Davis-Bacon Act require federal construction contracts to contain language about weekly payroll records.  The first is 29 C.F.R. § 5.5, which requires most federal construction contracts to contain a term obligating the contractor to submit weekly payroll records for itself and its subcontractors, including certifications (from itself

and its subcontractors) that the payroll information is correct and complete. Id. § 5.5(a)(3)(ii)(A)–(B). Contracts must also contain a provision that states: "The falsification of any of the above certifications may subject the contractor or subcontractor to civil or criminal prosecution under section 1001 of title 18 . . . ." Id. § 5.5(a)(3)(ii)(D).

The second regulation is 48 C.F.R. § 22.407, which provides that most federal construction contracts must include certain other mandatory terms. One of those terms requires submission to the contracting agency of weekly payroll records that are certified by the contractor or subcontractor as correct. See 48 C.F.R. § 52.222-8(b). The regulation also requires contracts to warn that "[t]he falsification of any of the certifications in this clause may subject the Contractor or subcontractor to civil or criminal prosecution under section 1001 of title 18[, the False Statements Act]." Id. § 52.222-8(b)(4).

## B. The Contracts and the Forms Submitted

Beck's contract with the CDC required Beck to collect and submit to the CDC certified payroll records from "all subcontractors" on the CDC project. Beck was also required to ensure that "any subcontractor or lower tier subcontractor performing construction within the United States," such as IWES, complied with those CDC reporting requirements. Having Beck shoulder the responsibility for gathering and forwarding the reports from subcontractors on the project was

6

consistent with the applicable regulation. See 48 C.F.R. § 52.222-8(b)(1) ("The Prime Contractor is responsible for the submission of copies of payrolls by all subcontractors.").

The contract also provided that if Beck failed to carry out its responsibility to gather and submit the required payroll information, the CDC could withhold funds, terminate the contract, or even debar Beck or the subcontractors, or both, from working on a government contract again. That contract clause was consistent with the applicable regulation. See id. § 52.222-8(c) ("[F]ailure to submit the required records upon request or to make such records available may be grounds for debarment action pursuant to 29 C.F.R. 5.12.").

To carry out its reporting responsibilities, Beck included in its contract with Mulkey a clause that required Mulkey to submit to Beck not only its own certified payroll records but also those of all of its subcontractors, including IWES. Each week Beck gave to the CDC all of those payroll records, as it was required to do under the contract. Those records included the ones IWES had submitted to Mulkey for submission to Beck. See 40 U.S.C. § 3145(a) ("[E]ach contractor and subcontractor each week must furnish a statement on the wages paid each employee during the prior week."); 29 C.F.R. § 3.3(b) ("Each contractor or subcontractor engaged in the construction . . . of any public building or public

7

work . . . shall furnish each week a statement with respect to the wages paid to each of its employees engaged on work . . . .").

The contract between IWES and Mulkey required IWES to submit to Mulkey payroll records in the form of timesheets and invoices for its workers, but the contract did not explicitly require the copies to be certified. But Arbelaez believed that IWES would not get paid unless it submitted certified copies of its payroll records to Mulkey. So IWES certified the weekly payroll records and submitted them using Department of Labor Form WH-347, as recommended in the regulations. See 29 C.F.R. § 3.3(b); 48 C.F.R. § 52.222-8(b)(1)–(2). That form included the following notice: "THE WILLFUL FALSIFICATION OF ANY OF THE ABOVE STATEMENTS MAY SUBJECT THE CONTRACTOR OR SUBCONTRACTOR TO CIVIL OR CRIMINAL PROSECUTION. SEE SECTION 1001 OF TITLE 18 AND SECTION 231 OF TITLE 31 OF THE UNITED STATES CODE." Arbelaez, Bazantes, or an IWES employee they authorized to do so on their behalf signed each of the WH-347 forms certifying that the IWES payroll and other information on it was accurate.

IWES submitted those forms to Mulkey, which submitted them to the general contractor, Beck. Beck submitted those forms to the CDC. In that way the CDC received certified payroll information on a Department of Labor form filled out by, or at the direction of, Arbelaez and Bazantes. At least some of the

8

statements or entries on some of those certified payroll records were "false, fictitious, or fraudulent" within the meaning of § 1001(a)(3).

## C.  The Motive and the Scheme

Motive is not an element of a False Statements Act crime.  And it hasn't been an element since 1934 when Congress amended the Act to delete the requirement that the false statements be made "for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States." See United States v. Rodgers, 466 U.S. 475, 477–78 (1984).  But Arbelaez and Bazantes did have a motive; they did act with a purpose.  Here is what it was.

IWES had been reporting to the IRS that a number of its workers were independent contractors instead of its employees.  By doing that IWES avoided having to pay an employer's share of payroll taxes on those workers.  But Arbelaez and Bazantes did not want the CDC to know that those workers were paid as independent contractors because that might cause the CDC to ask questions, pause payment, or even call in the Department of Labor to investigate.  Not only that, but the contract with Mulkey required IWES to:  "[m]ake timely payment to its Employees for their weekly wages and provide them with any benefits offered by Employer" and to "[w]ithhold and transmit all federal and state payroll taxes pursuant to the applicable laws, provide unemployment insurance and workers' compensation insurance and handle any claims under said policies involving its

9

Employees." The contract didn't say anything about IWES treating any workers as independent contractors.

To evade the contractual requirement to treat their employees as employees while appearing to comply, and to keep the CDC from knowing that they were treating some IWES workers as independent contractors, Arbelaez and Bazantes devised a scheme. They had their bookkeeper construct what would have been the payroll with all withholdings, including payroll taxes, taken out of the paychecks as if the workers in question had actually been treated as employees. They then certified, or had certified, that phony payroll as accurate on the DOL Form WH-347 and had it sent to Mulkey who, in turn, passed it along to Beck who submitted it to the CDC. But many of the workers whom Arbelaez and Bazantes reported to the CDC as employees on the certified payroll records were actually treated as independent contractors by IWES.

To make their scheme work, Arbelaez and Bazantes would regularly give their bookkeeper a chart that included each worker's weekly pay. The chart included a column titled "RL/FK W2/1099." In that column beside each worker's name was a "W2.REAL" for each real employee (one who was actually treated as an employee) or a "W2.F" for each fake employee (one who was actually treated as an independent contractor). The "W2.REAL" employees had their payroll taxes withheld and reported to the IRS, as is done for real employees. No problem there.

10

But the "W2.F" employees did not actually have payroll taxes withheld from their paychecks, just as real independent contractors don't have them withheld. Unlike real independent contractors, though, the "W2.F" workers received two checks. The first one looked like the checks that the "W2.REAL" employees received: payroll taxes and other amounts were withheld. But the second check that the "W2.F" workers received reimbursed them for the payroll taxes that had been withheld from the first check. The result was that the pay of the "W2.F" workers was the same as if they had been independent contractors: pay without reduction for payroll taxes. Treating employees as independent contractors saves an employer money — the employer's share of the payroll taxes, for one thing.[1]

---

[1] The testimony of Sergio Rada, one of the workers, provides a good example of how the two-payroll system worked to IWES's advantage. On November 2, 2012, Rada received a paystub showing gross weekly pay of $1,040. $20 was deducted for an employee expense, leaving a net of $1,020. And a total of $91.02 was deducted for social security withholding, Medicare tax withholding, federal income tax withholding, and state income tax withholding:

- PAY on 10/28/12: $1,040
- FICA W/H (Social Security): -$43.68
- MEDICARE W/H: -$15.08
- FEDERAL W/H: -$19.51
- STATE W/H: -$12.75
- CLOCK IN/OUT KEY (employee expense): -$20.00
- Payroll Check: $928.98

But IWES issued a second check to Rada for $91.02, paying him back for the fake tax deductions (as it always did for its fake employees, who were actually treated as independent contractors). Had Rada actually been treated like an employee, IWES would have been obligated to deduct taxes from his payroll and pay its own share of payroll taxes for him. In 2012, an employer had to pay 6.2% of an employee's income in Social Security taxes and 1.45% in Medicare taxes, while an employee had to pay 4.2% and 1.45% respectively. See Social

Arbelaez and Bazantes reported the "W2.F" group of workers to the IRS as independent contractors for tax purposes, which is the net effect of how they were treated when their two paychecks were totaled.  The problem is that through the chain of submission from IWES to Mulkey to Beck to the CDC, Arbelaez and Bazantes reported to the CDC the opposite of what they were reporting to the IRS.  They certified to the CDC that those same "W2.F" workers were IWES employees, not independent contractors.[2]  Telling the IRS one thing and the CDC another is asking for trouble, and trouble is what they got.

## II.  THE PROCEDURAL HISTORY

Someone complained to the Department of Labor about the two-check system for the W2.F workers.  That complaint led to an investigation.  And that

Security & Medicare Tax Rates, Social Security Administration, https://www.ssa.gov/OACT/ProgData/taxRates.html (last visited Sept. 29, 2020).

So if Rada had been treated as an employee, IWES would then have had to pay $64.48 (6.2% of $1,040) in Social Security taxes on his behalf.  IWES also would have had to pay $15.08 (1.45% of $1,040) in Medicare taxes.  By doing what it did, IWES shifted the burden of the employer's share of the Social Security and Medicare taxes onto Rada, saving itself $79.56 on Rada alone each weekly pay period.  By lowering its costs in that way, IWES gained a competitive advantage compared to any similar company that treated its workers as employees.

[2] In the indictment, the government alleged that the scheme also amounted to tax fraud because the workers were improperly classified as independent contractors instead of employees, thereby enabling IWES to illegally avoid paying its part of their payroll taxes.  Arbelaez and Bazantes were acquitted of the tax fraud charges, but for the purposes of the false statement charges for which they were convicted, it does not matter whether they improperly attempted to evade taxes.

What matters is that Arbelaez and Bazantes lied on the forms that went to the CDC about whether IWES's workers were paid as employees or paid as independent contractors.  Through the phony payroll records, Arbelaez and Bazantes represented that some of their workers were paid as employees when they were actually paid as independent contractors.

investigation led to an indictment.  Arbelaez and Bazantes were each charged with one count of conspiracy to defraud the United States; with five counts of willful tax fraud; and with six counts of violating 18 U.S.C. § 1001(a)(3) by making false statements in the certified payroll information contained in six of the DOL Form WH-347s submitted to the CDC.

Arbelaez and Bazantes moved to dismiss the six § 1001(a)(3) false statement counts of the indictment, arguing that the payroll information submitted on the DOL forms was neither material to nor within the jurisdiction of the CDC, which are elements of a § 1001(a)(3) crime.  The magistrate judge viewed their argument as a sufficiency of the evidence challenge better suited for trial and recommended denying the motion to dismiss.  The district court agreed.

The case went to trial.  At the end of the government's case-in-chief Arbelaez and Bazantes moved for a judgment of acquittal, which the court denied. The court also denied their renewed motion for a judgment of acquittal at the close of all evidence.  The jury found them not guilty of the tax fraud charges but guilty of conspiring to willfully and knowingly submit false statements in certified payroll records to the CDC in violation of § 1001 and guilty of the six underlying § 1001(a)(3) false statement crimes.  After the verdict Arbelaez and Bazantes moved a third time for a judgment of acquittal and, in the alternative, asked for a new trial.  And for a third time the court denied their motion.  It entered judgment

13

on the verdicts.  The court also denied their request for a new trial, a ruling they do not challenge in this appeal.

### III.  THE TWO CONVICTION ISSUES

The specific part of the False Statements Act that Arbelaez and Bazantes were convicted of violating is codified in 18 U.S.C. § 1001(a)(3).  It prohibits knowingly and willfully making or using a false writing or document in any matter within the jurisdiction of the any of the three branches of the federal government, knowing that document contains a materially false, fictitious, or fraudulent statement or entry.  The five elements of a § 1001(a)(3) crime are that: (1) the defendant made or used a writing or document; (2) it contained a false statement or entry; (3) the falsehood was material; (4) the writing or document was made or used in a matter within the jurisdiction of the executive, judicial, or legislative branch of the government of the United States; and (5) the defendant acted willfully, knowing the document contained a false statement or entry.  See 18 U.S.C. § 1001(a), (a)(3); United States v. Blankenship, 382 F.3d 1110, 1132 (11th Cir. 2004) ("For a conviction to be sustained under § 1001(a)(3), it is imperative that the 'writing or document' be 'false.'"); id. at 1136–41 (discussing the "within the jurisdiction" element); United States v. Calhoon, 97 F.3d 518, 523 (11th Cir. 1996) (listing the elements of a "violation of 18 U.S.C. section 1001" before the statute was divided into subsections like § 1001(a)(3)); see also 11th

14

Cir. Pattern Crim. Jury Instr. O36 (2020).  The district court instructed the jury on all five elements.

In challenging their convictions, Arbelaez and Bazantes contend, as they have throughout the case, that the prosecution fails on the "within the jurisdiction" element and also on the materiality element.  Both contentions are well preserved, but neither is well taken.

A.  The "Within the Jurisdiction" Element

We begin with the element that the false document containing the false statement must have been made or used "in any matter within the jurisdiction of the executive . . . branch of the Government of the United States."  18 U.S.C. § 1001(a).  Arbelaez and Bazantes challenged this element in the district court both in their motion to dismiss the indictment and in their motions for judgment of acquittal.  Because, as we will soon discuss, false statements in Copeland Act payroll records are within the jurisdiction of a federal agency as a matter of law, we reject both the indictment challenge and the sufficiency of the evidence challenge.[3]

_____

[3] The indictment alleged that Arbelaez and Bazantes made their false statements in certified payroll forms that are mandatory under federal law for federal construction projects.  In other words, they made their false statements in Copeland Act payroll records.  For the reasons we will soon discuss, that is sufficient as a matter of law to allege that the jurisdiction element of § 1001(a) is satisfied.

1.  The Copeland Act Itself Establishes that the Payroll Records It Requires to be Submitted Are Matters Within the Jurisdiction of the Executive Branch of the Government

Whatever else may be covered by § 1001(a)'s phrase "matter within the jurisdiction of" one of the three branches of government, the Copeland Act itself tells us that it does cover statements in the payroll records that contractors and subcontractors must furnish in a construction project for a federal agency. It does so in 40 U.S.C. § 3145. Subsection (a) requires the Secretary of Labor to prescribe regulations that, among other things, provide that "each contractor and subcontractor each week must furnish a statement on the wages paid each employee during the prior week." 40 U.S.C. § 3145(a). Subsection (b) provides: "Section 1001 of title 18 applies to the statements." Id. § 3145(b).

Here's the background for subsection (b). The original Copeland Act was enacted in 1934, and from the beginning it required the adoption of regulations obligating contractors and subcontractors on federal construction projects to submit weekly payroll records. See Copeland Act, ch. 482, § 2, 48 Stat. 948, 948 (1934). At first those records had to be in the form of "sworn affidavit[s]." Id. But in 1958 the Act was amended to state that the weekly payroll records should be in the

---

And the evidence at trial showed that they made their false statements in Copeland Act payroll records. Which means the motions for judgment of acquittal were also due to be denied to the extent they challenged whether the "within the jurisdiction" element was satisfied.

16

form of "statement[s]"; affidavits were no longer required. See Pub. L. No. 85-800, § 12(a), 72 Stat. 966, 967 (1958). That provision is now in subsection (a) of § 3145. 40 U.S.C. § 3145(a). At the same time, Congress added language in subsection (b) providing that 18 U.S.C. § 1001, the False Statements Act, "shall apply" to the payroll records the Copeland Act required to be submitted. See Pub. L. No. 85-800, § 12(b), 72 Stat. at 967. After a non-substantive rewording in 2002, that Copeland Act language now says with pointed simplicity: "Section 1001 of title 18 applies to the statements." 40 U.S.C. § 3145(b).

With that 1958 amendment Congress accomplished two things. First, it eased the burden of complying with the Copeland Act's weekly payroll reporting requirement by no longer requiring that the reports be in affidavit form. Second, it ensured that false statements in those payroll records were still subject to criminal sanctions even though they were no longer submitted as sworn affidavits. Congress did that by explicitly providing in the Copeland Act that 18 U.S.C. § 1001 applies to the statements in the payroll records that must be submitted.

What does it mean for the statute to say that § 1001 "applies" to the statements in the payroll records? The most logical reading is that those statements are matters within the jurisdiction of the executive branch, specifically the federal agency or department to which the records are submitted. Recall the five elements of a § 1001(a)(3) prosecution. See supra p.15. Section 3145(b) must

17

have some impact on those elements in prosecutions involving Copeland Act payroll records, or else it would have no effect, no meaning, no application to anything. And we can't interpret legislation to be utterly pointless. See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001); Duncan v. Walker, 533 U.S. 167, 174 (2001); Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 698 (1995).

The most logical reading of § 3145(b) is that the payroll records required to be submitted by the Copeland Act do satisfy the "within the jurisdiction" element of the False Statements Act, 18 U.S.C. § 1001. Unlike all of the other elements — which are fact-bound questions about the falsity of statements in those records, the materiality of the falsehoods, and the state of mind of the maker, all of which can vary from case to case — the jurisdiction element can be satisfied by the statutory context in which the statement was made or the record was submitted, which does not vary from case to case. See Bryson v. United States, 396 U.S. 64, 71 (1969) ("A statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent statements under § 1001.") (footnote omitted). Every case involving a Copeland Act payroll record that must be submitted to comply with § 3145(a) will involve the same statutory context: the Copeland Act. In § 3145(b) Congress made clear that payroll records submitted in that context are within the jurisdiction of the federal agency or department to which they are

18

submitted.  To the extent that § 1001(a)'s language "any matter within the jurisdiction of the executive . . . branch" could have been interpreted otherwise before the enactment of the 1958 amendment that became § 3145(b), it no longer can be.

It would make no sense to conclude that § 3145(b) relates to any of the other elements of § 1001(a)(3).  Not every payroll record submitted under the Copeland Act will contain a false or fraudulent statement, not every payroll record containing a false statement will be made or used willfully and with knowledge of the statement's falsehood, and not every false statement will be material.  By enacting § 3145(b), Congress surely did not mean that every element of the § 1001 crime is satisfied by every payroll record submitted under the Copeland Act.  If it had, then contractors and subcontractors could be convicted and imprisoned for submitting truthful payroll records, or for making false entries accidentally, or for making false entries that are completely immaterial.  That would be absurd.  As a result, if § 3145(b) means anything — and we should presume that it means something — it must mean that the within the jurisdiction element of § 1001 is satisfied whenever payroll records are submitted to federal agencies under the Copeland Act.

Of course, the views of a later Congress about what an earlier one meant carry little, if any, weight.  See Pitch v. United States, 953 F.3d 1226, 1241 (11th Cir. 2020) (en banc) ("'[P]ost-enactment legislative history (a contradiction in

19

terms) is not a legitimate tool of statutory interpretation,' because by definition it could have had no effect on the congressional vote.") (quoting Bruesewitz v. Wyeth LLC, 562 U.S. 223, 242 (2011)).  But that is not what we are talking about here.

What we are talking about is the power of Congress to amend existing statutes, and that is what Congress did in 1958 when it amended the Copeland Act, but with the wrinkle that one provision had the effect of amending, or at least clarifying, the False Statements Act.  In doing that, the 1958 Congress was not expressing its views about what the 1934 Congress meant when it enacted the original Copeland Act.  Instead, it was legislating that, at least from that point forward, any statement in a payroll record required to be submitted as part of a federal construction project would be, for § 1001 purposes, within the jurisdiction of the agency to which it was submitted.  That is the most sensible interpretation of the 1958 amendment that is now codified in § 3145(b).

Congress could remove any "within the jurisdiction" issues from § 1001 prosecutions for false statements in Copeland Act payroll submissions by amending the Copeland Act just as effectively as it could have by amending the False Statements Act's § 1001 to provide the same thing.  And that is what Congress did — it amended the False Statements Act by adopting an amendment to the Copeland Act that referred to it.  See 40 U.S.C. § 3145(b).

20

There is one other thing we would add to this discussion.  It concerns a point made 35 years ago by then-Judge Antonin Scalia, writing for another court of appeals.  In United States v. Hansen, 772 F.2d 940 (D.C. Cir. 1985), he considered the existence of some provisions scattered in various places in the United States Code that state § 1001 "applies" or "shall apply" to certain statements that are made in connection with those parts of the Code.  Id. at 946–47.  In other words, provisions like § 3145(b).  Given that § 1001 is "self-operative" and describes in general terms the statements to which it applies, why, he asked, has Congress sometimes specified in the legislation that required certain reports that false statements in them would be subject to prosecution under § 1001?  He concluded that the "likely explanation is that Congress included the references to § 1001 as a means of reminding those subject to the new laws of the self-operative, previously enacted sanctions, or as a means of clarifying for its own Members who voted upon the new laws the consequences of their action."  Id. at 946.  In other words, he said, "Congress chose in some cases to make assurance doubly sure."  Id. at 947.  Given § 3145(b) of the Copeland Act, as amended, we are doubly sure that payroll records required to be submitted under the Act are within the jurisdiction of a federal agency for purposes of § 1001.  Section 3145(b) is an independently adequate reason for holding that the IWES payroll records are a "matter within the

21

jurisdiction of the executive . . . branch" of the federal government.  18 U.S.C. § 1001(a).  It is not the only reason for doing so.

### 2.  Supreme Court Precedent Requires the Same Result

Another independently adequate, alternative ground for reaching the same result is that Supreme Court precedent dictates it.  The Court has instructed us that the term "jurisdiction" is "not [to] be given a narrow or technical meaning for purposes of § 1001."  Bryson, 396 U.S. at 70; accord Rodgers, 466 U.S. at 480 ("[W]e have stressed that the term 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001.") (quotation marks omitted).  It has instructed us that as used in § 1001, the term "jurisdiction" does not admit of a "constricted construction," but instead "the statutory language . . . covers all matters confided to the authority of an agency or department."  Rodgers, 466 U.S. at 479.  An agency's jurisdiction for these purposes is not limited to the "legal power to interpret and administer the law," nor is it confined "to matters in which the Government has some financial or proprietary interest."  Id. at 480.  An agency has jurisdiction under § 1001 when it "has the power to exercise authority in a particular situation."  Id. at 479.

And most specifically for our purposes, the Supreme Court has with simple clarity held — not once, but twice — that: "A statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent

22

statements under § 1001." Bryson, 396 U.S. at 71; accord Rodgers, 466 U.S. at 481 (quoting and reiterating that holding from Bryson). We take the Court at its word. See Mathis v. United States, 136 S. Ct. 2243, 2254 (2016) ("[A] good rule of thumb for reading our decisions is that what they say and what they mean are one and the same."). Especially when the Court has not only stated a rule but also reiterated it in a later decision, as it has done on this point.

The rule that if a statute gives an agency authority to request the records, the agency has "jurisdiction enough to punish fraudulent statements under § 1001" was first announced in the Bryson case. A statute barred any union from using the National Labor Relations Board's machinery to protest unfair labor practices unless each of the union's officers had filed a "'non-Communist' affidavit" with the Board. Bryson, 396 U.S. at 67. The petitioner was convicted of violating § 1001 by lying in his affidavit. Id. The Supreme Court held that because the NLRB's authority to act on a union's unfair labor charges was statutorily conditioned on the filing of the affidavits, "the Board received petitioner's affidavit pursuant to explicit statutory authority," and that was enough to establish that the "petitioner made a false statement in a 'matter within the jurisdiction' of the Board." Id. at 71; accord Rodgers, 466 U.S. at 481 (reiterating Bryson's recognition that § 1001 furthers the "valid legislative interest in protecting the integrity of official inquiries" and its holding that if a statute authorizes the agency

23

to receive the information, the statements submitted to the agency are within its jurisdiction for purposes of § 1001) (quoting Bryson, 396 U.S. at 70).

The rule applies in this case.  As we have explained, the Davis-Bacon Act itself and the Copeland Act itself, and the regulations adopted by the Department of Labor in obedience to directives in those acts, require that each contractor and subcontractor working on federal construction projects make and submit weekly payroll records to the federal agency in charge of the project.  See supra pp. 3–6.  Those statutes and regulations not only authorize the agency to request the records, they also require the agency to insist on submission of the records as a condition of participating in the federal project.  See id.

The payroll records that must be made, used, and submitted on a federal construction project include the worker's: correct classification for prevailing wage purposes, hourly wage rate, anticipated fringe benefits, hours worked, deductions from pay, and actual wages paid.  See 48 C.F.R. § 52.222-8(a), (b)(1).  That information is essential to enforcement of the Davis-Bacon Act's prevailing wage requirements and the Copeland Act's anti-kickback provisions.  See supra pp. 3–6.

The regulations also provide that after "such examination and check as may be made" by the federal agency, a copy of the submitted payroll records "shall be kept available, or shall be transmitted together with a report of any violation, in accordance with applicable procedures prescribed by the United States Department

24

of Labor." 29 C.F.R. § 3.4(a). In that manner, the CDC was explicitly given the statutory and regulatory authority to receive the payroll records that Arbelaez and Bazantes made or used, to examine them for compliance with the law, such as the Davis-Bacon Act and the Copeland Act, to keep the records available, and to report to the Department of Labor any violations of the law that the records reveal. See supra pp. 3–6.

The CDC also had the authority to enforce the payroll reporting requirements itself. If the payroll reports were not filed, the CDC could have withheld funds, terminated the contract, or even taken action leading to the prime contractor or a subcontractor, or both, being debarred — prevented from working on another government construction project for a period of years. See 40 U.S.C. § 3144(b); 29 C.F.R. § 5.12; 48 C.F.R. § 52.222-12; 48 C.F.R. § 352.242-73 (2010).[4] And those aren't empty threats. At trial, the CDC's project manager was questioned about what would have happened if payroll records had truthfully shown that tax withholdings had not been made for some employees. He testified that would have been "abnormal," something he had never seen before. He also

---

[4] Beck's contract with the CDC included the contract terms set out in 48 C.F.R. § 52.222-8 and in 48 C.F.R. § 352.242-73 (2010). Section 352.242-73 was rescinded in 2015 because it was duplicative. See Health and Human Services Acquisition Regulation, 80 Fed. Reg. 11,266 (proposed Mar. 2, 2015) (explaining why § 352.242-73 would be rescinded); Health and Human Services Acquisition Regulations, 80 Fed. Reg. 72,150 (Nov. 18, 2015) (rescinding § 352.242-73). But it was in force in September 2010 when Beck signed the CDC contract.

testified that he would have notified the general contractor, Beck, that there was a problem, and that he also would have withheld payment on the project until Beck "resolved" the issue.  And he added that "if they did not correct the problem in an expedient manner, we would automatically contact the Department of Labor and tell them of the problem."

The Davis-Bacon Act and the Copeland Act, and the regulations implementing them, provided the CDC with a statutory basis for its authority to request, receive, and examine the certified records of the payroll of IWES on the project to construct a $63 million office building for the CDC.  That statutory language, as the Supreme Court put it in Bryson and Rodgers, "provides jurisdiction enough" to punish under § 1001 false statements contained in the submitted records.  It is that simple.

The fact that the Supreme Court has twice squarely held that the "within the jurisdiction" element of a § 1001(a) crime is satisfied if there is a statutory basis for the agency to request the information submitted, as is indisputably true in this case, is another independently adequate basis for holding, as we do, that the IWES payroll records Arbelaez and Bazantes made or used were matters within the CDC's jurisdiction.

But what about the fact that the payroll records for IWES were not submitted directly to the CDC but instead were sent through the contractual chain from IWES

26

to Mulkey to Beck to the CDC?  See supra pp. 3, 6–9.  That is the route of submission provided in the contracts and in the regulations implementing the statutes.  See 29 C.F.R. § 3.3(b) (requiring that each contractor or subcontractor furnish the payroll information); 29 C.F.R. § 5.5(a)(3)(ii)(A) (giving the prime contractor the responsibility for submitting the payroll records that the subcontractors furnish it); 48 C.F.R. § 52.222-8(b)(1) (same).  That Arbelaez and Bazantes employed the chain of communication set out in the contract and regulations by having intermediaries actually submit their false statements to the CDC does not affect the application of § 1001.

Under § 1001(a)(3) the crime is not to personally or directly submit to a federal agency a document containing false or fraudulent statements or entries.  Instead, the crime is to knowingly and willfully "make[] or use[]" such a false statement or record that is, whether known or unknown to the defendant, in a matter within the jurisdiction of a federal agency.  See 18 U.S.C. § 1001(a)(3).  The Supreme Court's Yermian decision held that to violate § 1001 the person who makes or uses a false record does not even have to know that it will ever be submitted to a federal agency.  See United States v. Yermian, 468 U.S. 63, 74–75 (1984).  The defendant in Yermian, like Arbelaez and Bazantes, made statements to a private company that were later transmitted to the federal government.  Id. at 65.  And he, like Arbelaez and Bazantes, certified that his statements were true.  Id.

27

The defendant's sole defense in Yermian was that he had no knowledge that the private company would transmit to a federal agency his false statements. Id. at 66. The Supreme Court held that did not matter because "lacking from this enactment [§ 1001] is any requirement that the prohibited conduct be undertaken with specific intent to deceive the Federal Government, or with actual knowledge that false statements were made in a matter within federal agency jurisdiction." Id. at 73. The Court explained that Congress had "the power to impose criminal sanctions for deliberately false statements submitted to a federal agency, regardless of whether the person who made such statements actually knew that they were being submitted to the Federal Government," and "[t]hat is precisely what Congress has done here." Id. at 74–75.

That the prime contractor, Beck, actually handed over to the CDC the false payroll records of IWES does not change the fact that Arbelaez and Bazantes made and used those false records. It does not mean the payroll records of the IWES workers on the CDC construction project were any less a "matter within the jurisdiction" of the CDC. The Supreme Court's Yermian decision settles that. Because, as Yermian held, a defendant need not even know that his statements will be transmitted to a federal agency, he surely doesn't have to make those statements directly to the federal agency for the jurisdiction element to be satisfied. See id.; see also United States v. Herring, 916 F.2d 1543, 1547 (11th Cir. 1990) ("[T]his

28

court has held that false statements need not be presented to an agency of the United States . . . for federal agency jurisdiction to exist under section 1001."); United States v. Suggs, 755 F.2d 1538, 1542 (11th Cir. 1985) ("It is undisputed that in order to be within agency jurisdiction of section 1001, the false statement need not be presented directly to an agency of the United States."); United States v. Baker, 626 F.2d 512, 513–14, 515 n.6 (5th Cir. 1980) (holding that "[federal] agency jurisdiction [was] clear" where the defendants made their false statements to a municipal agency, not directly to a federal one).[5]

### 3. Our Lowe and Blankenship Decisions

Arbelaez and Bazantes contend that under the prior panel precedent rule two of our earlier decisions prevent us from holding that the IWES payroll records that were submitted to the CDC are "any matter within the jurisdiction" of the CDC for § 1001 purposes. They assert that position even though 40 U.S.C. § 3145(b) of the Copeland Act plainly dictates the conclusion that these payroll records are a matter within the jurisdiction of the CDC. See supra pp. 17–23. And they insist that two decisions of this Court establish that the false records in this case are not any matter within the jurisdiction of a federal agency even though the Supreme Court has twice held that if a federal agency has statutory authority to request records, as

---

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981.

the CDC does under the Copeland Act, the records are a matter within the jurisdiction of the agency.  See Bryson, 396 U.S. at 71; Rodgers, 466 U.S. at 481; see also supra pp. 23–28.

The two decisions that Arbelaez and Bazantes insist compel us to hold that the payroll records in this case are not a matter within the jurisdiction of the CDC are the Lowe and Blankenship decisions. See Lowe v. United States, 141 F.2d 1005 (5th Cir. 1944); Blankenship, 382 F.3d at 1141. They involved different federal agencies, different statements or records, and different statutes requiring or authorizing the agency to request the statements or records than this case does. The Lowe case involved a shipyard worker who lied to his employer about the number of hours he had worked on a project involving the employer's construction of a ship for a federal agency, which in turn reimbursed the employer for its inflated payroll payments.  See 141 F.2d at 1006.  A panel of this Court held that the worker's false statements were not a matter within the jurisdiction of the federal agency under the circumstances of that case.  Id.

In the Blankenship case, the principal of a trucking company that had contracted with a state agency to do work made false statements to it.  382 F.3d at 1116.  Those statements were about compliance with requirements that were a condition of the state agency receiving highway construction grants from a federal agency.  See id. at 1116–18, 1136–41. We held that the false statements were not a

30

matter within the jurisdiction of that federal agency under the circumstances of that case.  Id. at 1141.

"Under the well-established prior panel precedent rule of this Circuit, the holding of the first panel to address an issue is the law of this Circuit, thereby binding all subsequent panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court."  Smith v. GTE Corp., 236 F.3d 1292, 1300 n.8 (11th Cir. 2001); accord United States v. Smith, 201 F.3d 1317, 1322 (11th Cir. 2000) ("It is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court.") (quoting United States v. Hogan, 986 F.2d 1364, 1369 (11th Cir.1993)) (cleaned up); United States v. Steele, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (en banc) ("Under our prior precedent rule, a panel cannot overrule a prior one's holding even [if] convinced it is wrong.").

But the prior precedent rule applies only to the actual holdings of prior decisions on issues that were actually decided by the earlier panel.  See United States v. Birge, 830 F.3d 1229, 1232 (11th Cir. 2016) (holding that the rule that a panel cannot overrule a prior panel's holding applies only to holdings).  And "[a]s we have explained time and again: A decision can hold nothing beyond the facts of that case."  Id. at 1233 (cleaned up); accord, e.g., Watts v. Bell South Telecomms.,

31

Inc., 316 F.3d 1203, 1207 (11th Cir. 2003) ("Whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision."). To the extent that an earlier decision is distinguishable from the case at hand, it may be a prior precedent, but it is not one that can dictate the result of the current case under the prior precedent rule. See Scott v. United States, 890 F.3d 1239, 1257 (11th Cir. 2018).

Putting aside any other differences, there is one critically important circumstance in this case that was not present in the Lowe and Blankenship cases that makes all the difference under the prior panel precedent rule. As we have pointed out, the payroll records Arbelaez and Bazantes submitted up the chain to the CDC were submitted under the Copeland Act, 40 U.S.C. § 3145(a). See supra pp. 3–9. That statute explicitly provides that § 1001, the False Statements Act, applies to the statements that contractors and subcontractors are required to furnish. See 40 U.S.C. § 3145(b); supra pp. 2–4.

And as we have explained, that means Congress itself has foreclosed any debate about whether statements made or records submitted under the Copeland Act to a federal agency are within the jurisdiction of the federal agency that

32

receives them.  See supra pp. 17–23.  Congress has commanded that they are.

Section 3145(b) of the Copeland Act amounts to an explanatory or clarifying

amendment to § 1001 of the False Statements Act, an amendment Congress had

every right to make.  Our holding (or at least one of them) is that because of

§ 3145(b) the payroll records submitted to the CDC in this case were matters

within the jurisdiction of the CDC.  See supra pp. 17–23.

That holding is not inconsistent with either Lowe or Blankenship.  Neither of

those decisions involved the Copeland Act or any statements or records submitted

under that act.  Neither of those decisions involved statements or records submitted

under an act that specified, as the Copeland Act does in § 3145(b), that the

submissions were subject to § 1001 of the False Statements Act.  Neither of those

decisions could have held anything about the effect of § 3145(b) of the Copeland

Act on the "within the jurisdiction" issue in this case.  So neither Lowe nor

Blankenship serves as prior panel precedent for this issue in this case where the

facts and circumstances are different, chief among the differences being that

§ 3145(b) of the Copeland Act applies to this case but not to either of those two

cases.[6]

---

[6] Blankenship involved false statements made in the context of the Department of Transportation's Disadvantaged Business Enterprise (DBE) program.  See 382 F.3d at 1116. The DBE program is a regulatory program set out in 49 C.F.R. part 26.  Those regulations do warn that false statements made in the context of the DBE program may be referred to the Department of Justice for prosecution under 18 U.S.C. § 1001.  49 C.F.R. § 26.107(e); see also id. § 26.13(a) (noting the ability to "refer the matter for enforcement" under § 1001).  But those

## B.  The Materiality of the Payroll Records

Arbelaez and Bazantes contend that the falsified payroll records they created were not material under § 1001 and for that reason the district court should have granted their motions to dismiss the § 1001 counts in the indictment or should have granted their motions for a judgment of acquittal.   If materiality was not sufficiently alleged in the indictment, the motion to dismiss should have been granted.   If the evidence was insufficient to prove the materiality of the statements

---

regulations do not provide that any statements made within the context of the DBE program are within the jurisdiction of the federal agency.  And, much more importantly, those regulations are merely regulations, not statutes.  Section § 3145(b) of the Copeland Act is a statutory provision that has the effect of amending § 1001.  Congress can and does amend statutes at will.  Federal agencies, including the Department of Transportation, cannot.  See Cent. United Life Ins. Co. v. Burwell, 827 F.3d 70, 73 (D.C. Cir. 2016) ("Most likely, HHS intended only to amend the regulatory criteria because of course only Congress can amend its statutes."); In re Rivero, 797 F.3d 986, 992 (11th Cir. 2015) ("[O]nly Congress can amend [a] statute.").  As a result, while § 3145(b) functions as a statutory amendment to revise or clarify § 1001, the DBE regulations do not and cannot.

Nor do the statutes authorizing the DBE program contain any relevant reference to § 1001.  See Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 1101(b), 129 Stat. 1312, 1323–25 (2015); Moving Ahead for Progress in the 21st Century Act, Pub. L. No. 112-141, § 1101(b), 126 Stat. 405, 414–16 (2012); Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109-59, § 1101(b), 119 Stat. 1144, 1156–57 (2005); Transportation Equity Act for the 21st Century, Pub. L. No. 105-178, § 1101(b), 112 Stat. 107, 113–15 (1998); Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, § 1003(b), 105 Stat. 1914, 1919–21; Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424, § 105(f), 96 Stat. 2097, 2100 (1983).

The former Fifth Circuit's decision in Lowe did not suggest that the United States had any statutory basis to request that the defendant report to his private employer the number of hours he had worked.  See 141 F.2d at 1006.  All Lowe said on the subject was that the defendant's employer "was engaged in building ships under a contract with the United States Maritime Commission, an agency of the United States, providing that the company should make its payroll payments and should be directly reimbursed therefor by the Treasury of the United States."  Id.  It appears that in Lowe the government's authority to request information was contractual, not statutory.  As a result, there was no suggestion in the Lowe decision that any statute similar to § 3145(b) controlled the outcome of the jurisdiction element there.

alleged, the motion for judgment of acquittal should have been granted.  Neither of the conditional clauses in those two sentences is satisfied.

### 1.  The Sufficiency of the Indictment

"[T]he sufficiency of an indictment is a legal question that we review de novo."  United States v. Pendergraft, 297 F.3d 1198, 1204 (11th Cir. 2002).  In doing so, we consider only the facts alleged in the indictment.  United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006).  An indictment must present the essential elements of the offense and notify the defendants of the charges against them.  United States v. Bobo, 344 F.3d 1076, 1083 (11th Cir. 2003).  It can simply track the language of the statute that the defendants have been charged with violating so long as it also alleges enough facts to inform the defendants what they have been charged with doing.  See id.  The indictment in this case did that.

The indictment alleged that Arbelaez and Bazantes:

did willfully and knowingly make and use false writings and documents to the CDC, that is, certified payroll forms (DOL Forms WH-347), knowing the same to contain materially false, fictitious, and fraudulent statements and entries in a matter within the jurisdiction of the executive branch of the Government of the United States, by falsely representing on the certified payroll forms submitted to the CDC that employment taxes had been deducted from the wages of certain IWES workers who performed work on the CDC construction project.

(Emphasis added.)  That is enough.

Arbelaez and Bazantes argue that because the indictment does not allege that the forms containing the false payroll statements or records were directly addressed

35

to the CDC, the false statements were, as a matter of law, not material.[7]  That

materially misstates the materiality test.  Arbelaez and Bazantes rely on language

from decisions of this Court and the Supreme Court defining materiality as

whether a statement was "capable of influencing[] the decision of the

decisionmaking body to which it was addressed."  United States v. Gaudin, 515

U.S. 506, 509 (1995) (emphasis added and quotation marks omitted); accord

Kungys v. United States, 485 U.S. 759, 770 (1988); United States v. Boffil-Rivera,

607 F.3d 736, 741 (11th Cir. 2010).  But none of those decisions held that a false

statement ceases to be material if it is not made directly to the decisionmaking

body that it has the potential to influence.  In all three of those decisions, the

language that Arbelaez and Bazantes rely on is dicta because in each of those cases

the statements *were* made directly to the decisionmaking body or its agents.[8]

---

[7] The government contends, as it did in the district court, that because Arbelaez and Bazantes argue about the facts, their arguments do not pertain to the sufficiency of the indictment and instead should be considered only as a challenge to the sufficiency of the evidence presented at trial.  Maybe, but it doesn't matter because Arbelaez and Bazantes' arguments are not persuasive in any event.

[8] Kungys appears to be the first case where the Supreme Court defined "material" as "ha[ving] a natural tendency to influence, or [being] capable of influencing, the decision of the decisionmaking body to which it was addressed."  485 U.S. at 770 (quotation marks omitted).  But the Court in Kungys had no occasion to decide whether a statement ceases to be material if it is not made directly to the decisionmaking body it has the potential to influence.  The statements in Kungys were alleged misstatements that the defendant made in his immigration applications.  See id. at 764–65.  There was no suggestion in Kungys that the statements passed through any intermediaries or were "addressed" to anybody besides the federal government.  See generally id.

In Gaudin the Supreme Court quoted, but did not apply, Kungys' definition of materiality.  See 515 U.S. at 509.  The only question before the Court in Gaudin was whether the

Arbelaez and Bazantes must resort to dicta because our actual holdings foreclose their argument. More than once, we have upheld § 1001 convictions against materiality challenges where the defendant did not submit his statements directly to a federal agency. See Herring, 916 F.2d at 1547; Baker, 626 F.2d at 514. Our decision in Blankenship does not affect those holdings of Baker and Herring because Blankenship dealt with the jurisdiction element, not the materiality element. See 382 F.3d at 1136–41.[9]

We have held that the materiality requirement is met if "the false statement has the capability of affecting or influencing the exercise of a government function." Herring, 916 F.2d at 1547. The false statements that the indictment alleges Arbelaez and Bazantes made were capable of affecting or influencing the exercise of the CDC's function of enforcing the Copeland Act. They were capable

---

materiality element of § 1001 must be submitted to the jury, and the Supreme Court held that it must be. See id. at 522–23.

Finally, in Boffil-Rivera we quoted Gaudin's definition of materiality and relied on part of it. 607 F.3d at 741–42. But we did not hold that the defendant's statements were somehow immaterial because they were submitted through an intermediary. We couldn't have reached that holding because it wouldn't have been supported by the facts of the case: the defendant in Boffil-Rivera made his false statements directly to two ICE agents, not through an intermediary. Id. at 739; see also, e.g., Birge, 830 F.3d at 1232 ("[A] decision can hold nothing beyond the facts of that case." (quotation marks omitted)); Watts, 316 F.3d at 1207 (same); Aguillard, 217 F.3d at 1321 (same).

[9] If we were to hold that a false statement can be material only if the defendant submits it directly to a federal agency, our holding would be in tension with the Supreme Court's holding in Yermian. See 468 U.S. at 74–75 (holding that a statement can be within the jurisdiction of a federal agency for § 1001 purposes even if the defendant has no knowledge of any federal involvement).

of that because the false statements in the payroll records covered up the actual manner in which IWES was paying its workers. That is enough to allege that the false statements were material to the CDC for purposes of § 1001.

### 2. The Sufficiency of the Evidence

Arbelaez and Bazantes also challenge the district court's denial of their renewed Rule 29 motions for judgment of acquittal on the false statement counts. "The district court's denial of the motions for a judgment of acquittal will be upheld if a reasonable trier of fact could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt." United States v. Rodriguez, 218 F.3d 1243, 1244 (11th Cir. 2000). In deciding whether it does, we view the evidence in the light most favorable to the government. Hansen, 262 F.3d at 1236. And unlike a motion to dismiss the indictment, which confines courts to considering the allegations of the indictment, a motion for judgment of acquittal frees courts to look at all of the evidence presented at trial. See United States v. Williams, 390 F.3d 1319, 1323 (11th Cir. 2004).

We don't look for evidence that the false statements in the payroll records affected or influenced the CDC's actions or decisions. That's not necessary because when it comes to materiality, actual effect or influence is not required; capability or potential is enough. Gaudin, 515 U.S. at 509. "The false statement must simply have the capacity to impair or pervert the functioning of a government

38

agency." United States v. Lichenstein, 610 F.2d 1272, 1278 (5th Cir. 1980); see

Herring, 916 F.2d at 1547. "A statement can be material even if it is ignored or

never read by the agency receiving the misstatement." United States v. Diaz, 690

F.2d 1352, 1358 (11th Cir. 1982).

The arguments of Arbelaez and Bazantes rest on the false premise that the

false statements in the payroll records they submitted were not material because

they were not addressed to, or directly submitted to, the CDC. We have just

rejected that premise in connection with the denial of the motion to dismiss the

indictment, and we reiterate that rejection here. Just as the allegations in the

indictment were enough to state the required materiality element for purposes of

the sufficiency of the indictment, so too was the evidence introduced at trial

enough to prove materiality.

The falsified payroll information that was submitted included a certification

on a government form that itself indicated the labor was provided for a CDC

construction project. And the evidence showed that through the contracting chain

of command, the payroll information and certifications were ultimately submitted

to the CDC (as the law required them to be).

Other evidence proved that the false payroll information was capable of

influencing the CDC, which is the measure of materiality under § 1001. Michael

Payne, the project manager at the CDC assigned to the Atlanta project, testified

that if he had known the payroll information was false, he would have stopped paying for the work until he figured out what was going on. Even without that testimony, there was the telling fact that Arbelaez and Bazantes felt it necessary (or at least advisable) to hide from the CDC their workers' statuses as independent contractors. The jury reasonably could have inferred from that fact the falsified payroll information was capable of influencing the CDC. See Baker, 626 F.2d at 515.

In sum, the facts presented at trial proved that the false statements in the payroll records were capable of influencing the CDC. See Boffil-Rivera, 607 F.3d at 741–42. A reasonable fact finder could have found that those false statements were material. See Hansen, 262 F.3d at 1236. And the jury did. The district court did not err in denying the renewed motion for a judgment of acquittal on materiality grounds.

## IV. SENTENCING

Arbelaez's and Bazantes' Presentence Investigation Reports assigned a base offense level of 6 under U.S.S.G. § 2B1.1(a)(2).[10] The PSRs also stated that this was not the only time that Arbelaez and Bazantes had submitted falsified IWES payroll information to a federal government agency. They had done it in more than

---

[10] There were two PSRs, one for each defendant, but they were identical in all relevant respects.

30 federal projects IWES had been involved in during a two-year period. The PSRs calculated the loss amount by totaling the separate amounts that IWES had earned on all of those projects in which it had submitted false payroll information. Using that uncharged relevant conduct, the PSRs determined there was a $5 million loss to the government, justifying an 18-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J).

The PSRs also added a 2-level enhancement for sophisticated means under § 2B1.1(b)(10)(C), a 4-level enhancement for a leadership role under § 3B1.1(a), and a 2-level enhancement for obstruction of justice under § 3C1.1, bringing the total offense level to 32. With no prior convictions, Arbelaez and Bazantes each had a criminal history category of I, resulting in a recommended guidelines range of 121 to 151 months in prison.

Arbelaez and Bazantes objected to the sentencing calculations on several grounds, but the only one they pursue on appeal is their contention that they should not have been given any loss enhancement under § 2B1.1(b)(1)(J) because there was no loss to the government. At the sentence hearing the district court found that the government had suffered a loss, but that the amount of it could not be reasonably determined. As a result, relying on comment 3(B) of the commentary to § 2B1.1, the court decided that the defendants' gain should be the basis for determining the offense level.

To calculate their gain, the court began with the $5 million in government contracts in which Arbelaez and Bazantes had submitted falsified payroll records in all of the federal projects. It determined that, after subtracting for overhead, they netted on average 11.5% of the total contract price, which amounted to a gain of approximately $550,000, justifying under § 2B1.1(b)(1) an enhancement of 14 levels (instead of the 18 that the PSRs had recommended). Those 14 levels were added to the base offense level of 6 and to the 8 levels for other enhancements and specific offense characteristics, resulting in a total offense level of 28. With a criminal history at level I, the guidelines range was 78 to 97 months. The court sentenced Arbelaez and Bazantes each to 96 months in prison and to pay a fine of $75,000.

Arbelaez and Bazantes contend that the district court erred in finding that their offenses caused any loss. They argue that they provided the services that the CDC had contracted for (through the prime contractor and the first-tier subcontractor), and because they were presumably the lowest bidder, there was no loss to the CDC. If there was any loss to the CDC, they see it as offset by the services they provided. And if there was no loss to the CDC, they argue that the district court erred by relying on their gain to calculate the offense level. Although we review the district court's loss determination only for clear error, we review de

novo questions of law about the application of the sentencing guidelines. United States v. Tampas, 493 F.3d 1291, 1303 (11th Cir. 2007).

Section 2B1.1 of the guidelines applies to, among other crimes, fraud and deceit. One of the special offense characteristics is the loss amount. U.S.S.G. § 2B1.1(b)(1). The greater the loss to the victim, the greater the increase to the base offense level, and the higher the guidelines range in most cases. Id. Loss is defined in the commentary to § 2B1.1 as the greater of either the actual loss, which is the "reasonably foreseeable pecuniary harm that resulted," or the intended loss, which is the "pecuniary harm that the defendant purposely sought to inflict." U.S.S.G. § 2B1.1 cmt. n.3(A)(i)–(ii).[11] Losses must be offset by "the fair market value of . . . the services rendered" to the victim. U.S.S.G. § 2B1.1 cmt. n.3(E)(i); United States v. Campbell, 765 F.3d 1291, 1302 (11th Cir. 2014). A court can substitute the defendant's gain from the offense for the victim's loss "only if there is a loss but it reasonably cannot be determined." U.S.S.G. § 2B1.1 cmt. n.3(B). It is the government's burden to prove loss "with reliable and specific evidence." United States v. Maxwell, 579 F.3d 1282, 1305 (11th Cir. 2009).

---

[11] The commentary to the guidelines "is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of the guidelines." United States v. Fox, 926 F.3d 1275, 1278 (11th Cir. 2019) (quotation marks omitted). Neither party argues that the commentary is not authoritative here. And we see no reason why we should not treat it as authoritative.

Arbelaez and Bazantes correctly contend that the government did not prove any loss here. At sentencing and in its brief to this Court, the government focused on the loss to the CDC. Which is fine, except there is not a speck of evidence that the CDC suffered any "pecuniary harm." The government admits as much; instead of arguing that the CDC suffered a monetary loss, it argues that the lies in the falsified payroll records "compromised the integrity of the federal contract bidding process." While we appreciate the harm that fraud can do to a federal contracting process, and we in no way condone the conduct in this case, "compromised integrity" does not a pecuniary loss make. Every serious crime compromises the integrity of something or someone, but not every crime causes pecuniary loss.

The government also argues that if it were not for the falsified payroll records, the CDC would not have paid IWES — presumably by reducing its payments to the general contractor, who would then have reduced its payments to the first-tier subcontractor, who then would have reduced or stopped its payments to IWES. That argument does not support the government's position. Even if the CDC would have stopped payment until IWES properly classified its workers, there would still not have been any loss. The CDC would have paid the same amount and received the same benefit that it did without knowing about the false statements. IWES would have made less profit because the payroll taxes would have cut into its earnings, but that does not figure into whether the CDC had a loss.

44

And even if the CDC's loss was somehow the full amount that it paid to IWES, that amount must be offset by the fair market value of the services that the CDC received.  See Campbell, 765 F.3d at 1302.  Here the labor is the service that IWES provided.  And the government does not contend that the CDC did not receive the full, bargained-for benefit of the labor.  Offsetting the CDC's loss, which is the cost of the labor, by the fair market value of the labor leaves a net loss of zero.  The finding that there was a loss to the CDC was clearly erroneous.[12]

We have not considered whether gain can be used instead of loss where there is no loss.  When interpreting the guidelines we begin, of course, with the text of the guidelines, including the text of the commentary.  United States v. Fox, 926 F.3d 1275, 1278 (11th Cir. 2019).  The text of the commentary could scarcely be clearer:  courts can rely on gain "only if there is a loss but it reasonably cannot be determined."  U.S.S.G. § 2B1.1 cmt. n.3(B) (emphasis added).  There is nothing ambiguous about "only if."

The other circuits that have considered the question have also determined that the commentary means exactly what it says.  See, e.g., United States v. Robie,

―――――――――――――

[12] In the district court and before us, the government did not argue for, and in fact expressly disavowed, using tax revenue loss to the IRS as a measure of loss. (That would have involved counting as the loss the amount of payroll taxes that would have been collected if IWES had actually paid its workers as employees.)  Nor did the government argue that we should consider the loss that may have been suffered by other government subcontractors who did not lie about their workers' classifications.  We have no occasion to consider whether any alternative methods of calculating loss might have been permissible.

45

166 F.3d 444, 455 (2d Cir. 1999).  In Robie the defendant worked for a company that printed stamps for the federal government.  Id. at 447.  Some of the stamps were misprints, so the government ordered them destroyed.  Id.  But the defendant instead took them and traded them for other valuable stamps worth tens of thousands of dollars.  Id. at 448.  At sentencing, the district court had adopted the PSR's findings that there was no loss to the government when the defendant stole the stamps from his employer, because the government had ordered them destroyed.  Id. at 455.  The district court, relying on U.S.S.G. § 2B1.1, substituted the defendant's gain for the government's loss.  Id.  The Second Circuit vacated the defendant's sentence, holding that if there is no "economic loss" to the government, gain cannot be used as a substitute.  Id.; accord United States v. Coscia, 866 F.3d 782, 801 (7th Cir. 2017) ("[W]e will not substitute gain as a proxy for loss where there is 'no means of determining whether [the defendant's] gain is a reasonable estimate of [the victim's] loss.'") (quoting United States v. Vitek Supply Corp., 144 F.3d 476, 490 (7th Cir. 1998)) (first alteration added).

Because the district court erroneously applied the U.S.S.G. § 2B1.1(b)(1)(J) enhancement based on gain even though there was no loss, Arbelaez and Bazantes must be resentenced without that error.

46

## V. CONCLUSION

The convictions of Arbelaez and Bazantes are AFFIRMED.  Their sentences are VACATED, and the case is REMANDED for further sentence proceedings consistent with this opinion.